**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- X
NYTDA, INC., a/k/a                                                      :
NEW YORK TRUCKING &                                                    :   Civil Action No. _____
DELIVERY ASSOCIATION,                                                  :
                                                                       :   **VERIFIED**
                        Plaintiff,                                     :   **COMPLAINT FOR**
v.                                                                     :   **DAMAGES,**
                                                                       :   **DECLARATORY, AND**
CITY OF NEW YORK;                                                      :   **INJUNCTIVE RELIEF**
JEFFREY SHEAR, Deputy Commissioner, Treasury and                      :
Payment Services, NYC Department of Finance;                          :
AGNES RUSIN, Director of Parking Operations, NYC                      :   **JURY TRIAL**
Department of Finance; and                                             :   **DEMANDED**
MARYANN CORDOVA, Fleet/Rental Unit, NYC                               :
Department of Finance,                                                 :
                                                                       :
                        Defendants.                                   :
------------------------------------------------------------------- X

Plaintiff NYTDA, Inc., a/k/a the New York Trucking & Delivery Association

("NYTDA" or "Plaintiff"), for its complaint against defendants the City of New York (the

"City"), acting through its Department of Finance ("DOF"), and the individuals named above, in

their official capacities, alleges as follows:

## NATURE OF THE ACTION

1.     This action seeks compensatory damages, injunctive relief, and declaratory relief

under 42 U.S.C. § 1983 to remedy procedural and substantive due process and equal protection

violations of Plaintiff's property rights, protected by the Fourteenth Amendment to the United

States Constitution.  It also seeks comparable relief for due process and equal protection

violations under Article I, §§ 6 and 7 of the Constitution of the State of New York.

2.     Plaintiff's claims arise from the Department of Finance's administration of two

reduced fine parking ticket programs for commercial delivery vehicles in New York City under

the Rules of the City of New York, Title 19, Chapter 39, 19 RCNY § 39.01 *et seq*. (the "Rules").

1

Under these programs, DOF agrees to impose reduced fines for parking violations in NYC to owners or lessees of commercial vehicles if they enroll their vehicles and agree to waive certain rights and pay reduced fines within specified times, *inter alia*. 19 RCNY §§ 39.03-1 ("Stipulated Fines Program") and 39-03.2 ("Commercial Abatements Program") (collectively, the "Programs").

3.     This case does not concern DOF's system for adjudication of disputed parking tickets through its Parking Violations Bureau ("PVB"), except for comparing the panoply of due process and other rights afforded to ticket respondents in PVB's quasi-judicial adjudication of parking tickets, with available judicial review in New York state courts. DOF contends that Plaintiff and its members have waived the right to raise the issues presented in this case through DOF or in any courts.

4.     Plaintiff, a New York business corporation, is registered as a "brokerage company" with DOF and Kenneth J. Thorpe, Plaintiff's Chairman and CEO, is registered as a "broker." 19 RCNY § 39-09. Plaintiff is a payment processing agent with the DOF for almost 15 years, successfully transmitting over $125 million to DOF. Plaintiff primarily represents its approximately 750 members who are owners or lessees of commercial delivery vehicles active in New York City. Many of these vehicles are registered in states other than New York and all of them affect interstate commerce, either through travelling in interstate commerce or by delivering goods and services which travel in interstate commerce. Defendants' actions have had a substantial adverse impact on interstate commerce, particularly for out of state vehicles in the Programs. One of the crucial services which NYTDA provides to its members is the auditing, management and processing of parking tickets under the Stipulated Fine Program. Plaintiff manages all members' enrollments through password protected systems with the DOF. The

2

Plaintiff derives its revenues principally from membership dues and from savings its members achieve on parking tickets in the Programs.  Plaintiff has also been an advocate for its members with DOF, the NYC Council, and the Mayor on important issues that affect their business. Plaintiff and a class of its members previously brought an action challenging other ticketing practices of DOF which resulted in favorable outcomes for Plaintiff and its members, who were part of class, in 2015-2016.  *NYTDA, Inc. v. City of New York*, Case No. 11-cv-01836 (NGG) (MDG) (E.D.N.Y.).

5.    This case presents four principal issues as to whether the City has denied and continues to deny Plaintiff and its members procedural and substantive due process and equal protection, in violation of the U.S. and New York Constitutions, as applicable, by:

(1)    changing established policy, in a manner tainted with fundamental procedural irregularity, by both retroactively and prospectively enforcing invalid parking tickets against Plaintiff's members in DOF's Stipulated Fines and Commercial Abatement Programs for reduced fines for commercial vehicles (the "Programs") (for out of state registered vehicle since 2004 and for N.Y. registered vehicles since June 2019), deliberately flouting well-settled law that treats such tickets jurisdictionally defective and void under New York Vehicle & Traffic Law ("VTL") §§ 238(2) and (2-a)(b) because they lack mandatory information (including accurate "plate types") or contain inaccurate information, as held by the New York Court of Appeals, and under DOF Rules, 19 RCNY § 39-02, and where the City knows that all such void tickets issued to ticket recipients outside the Programs would be dismissed in DOF adjudicatory proceedings or in New York courts;[1]

---

[1]    The New York Court of Appeals held 35 years ago that parking tickets that violate VTL § 238(2) are invalid.  *Ryder Truck Rental, Inc. v. Parking Violations Bureau*, 62 N.Y.2d 667, 476 N.Y.S.2d 285 (1984).  In

(2)     abusing power to deliberately and systematically charge excess fines and penalties on parking tickets, which are paid more than 45 days after entry on DOF records, but prior to entry of judgment after 142 days, in clear violation of DOF Rules, 19 RCNY §§ 39-03.1(e) and 39-03.2(d) (eff. Mar. 6, 2014), resulting in substantial overpayment of fines, where Plaintiff and its members have a protected property interest in such reduced fines;

(3)     deliberately refusing to provide Plaintiff with relevant data concerning DOF's incorrectly calculated fines for parking tickets issued to Plaintiff's members in violation of VAT § 238(2) and (2-a)(b) and DOF's Rules, 19 RCNY § 39-02(a), so that Plaintiff and DOF could accurately correct DOF billings for Plaintiff's Program members and enter a reasonable agreement for payment of remaining balances due, where DOF Rules provide for abatement of penalties and judgments, 19 RCNY §§ 39-07 and 39-10, and as a matter of policy, DOF regularly and deliberately enters such agreements or allows the parking tickets of other similarly situated brokerage companies, brokers, and parties to remain unpaid without accruing penalties or entering judgment; and

(4)     upon information and belief, discriminating against Plaintiff and its members in connection with the above issues in deliberate and baseless retaliation, at least in part, for their prior litigation against the City, *NYTDA, Inc. v. City of New York*, Case No. 11-cv-01836 (NGG) (MDG) (E.D.N.Y.), by deliberately enforcing invalid tickets and imposing unlawful fines in disregard for NY law and DOF rules.

---

1992, that Court reiterated that ruling  in a case involving the same jurisdictional ticket defect—incorrect plate types. *Wheels, Inc. v. Parking Violations Bureau*, 185 A.D.2d 110, 112, 585 N.Y.S.2d 755 (1st Dep't 1992) (ticket violating VTL § 238 lacks "jurisdictional validity"), *aff'd*, 80 N.Y.2d 1014, 592 N.Y.S.2d 659 (1992) ("misdescription of any of the five mandatory identification elements ... mandates dismissal"). The Appellate Division recently vacated a DOF Appeals Board decision which upheld tickets with inaccurate plate types; it also annulled and vacated the 38 tickets at issue and declared that the City's policy regarding incorrect plate types violated VTL § 238.  *Nestle Waters North America, Inc. v. City of New York*, 121 A.D.3d 124, 990 N.Y.S.2d 512 (1st Dep't 2014).

6.      The City, through DOF and its officials, has two fundamental obligations to Plaintiff and Program Enrollees:  (1) to only pursue parking ticket cases with notices of violations which comply with New York law and DOF Rules, VTL §§ 238(2) and (2-a)(b) and 19 RCNY § 39-02(a)(3); and (2) to properly calculate fines and penalties for parking ticket violations in accordance with DOF Rules.  19 RCNY §§ 39-03.1(e) and 39-03.2(d).  The City has deliberately failed to meet these two primary duties.  The remaining issues follow from these fundamental violations by the City and its DOF.

7.      The City unlawfully contends that Plaintiff's Program Enrollee members have waived the right to object to the enforcement of invalid and void tickets and unlawfully calculated fines and penalties by participating in the Programs under DOF Rules and a related Enrollment Agreement.  19 RCNY §§ 39-03.1(a) and 39-03.2(a).  The purported waiver is inapplicable to the constitutional claims alleged herein, as it cannot operate as an invitation or license for Defendants to engage in rampant and systematic abuse of the City's own laws in derogation of privileges guaranteed to Plaintiff's members by those same laws.  The purported waiver is invalid and unenforceable under the circumstances presented in this Complaint – an arbitrary and irrational course of conduct without authority under law, which corrupted the operation of the Programs, deprived Plaintiff and its members of their federal and state constitutional rights and resulted in their loss of millions of dollars in unlawful fines and penalties in violation of  City, State and Federal laws.

## JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(1)-(4) over Plaintiff's claims under 42 U.S.C. § 1983.

9.      This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims which arise out of a common nucleus of operative facts as the federal claims and form part of the same case or controversy.

10.      Venue is proper in this District under 28 U.S.C. §1391(a) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, Plaintiff's principal place of business is located in this District, and the City administers its parking ticket programs throughout New York City, including in this District.

## THE PARTIES

11.      Plaintiff NYTDA, Inc. is a domestic business corporation organized under the laws of the State of New York on June 24, 2005, with its principal place of business in Kings County, New York.  Plaintiff has standing to bring this action for its own financial and reputational injuries caused by defendants' constitutional violations, as this Court held in a prior suit involving similar violations of DOF's parking ticket programs.  *NYTDA v. City of New York*, 11-cv-1836 (E.D.N.Y.) (NGG) (MDG) (claims regarding unauthorized parking tickets to Fleet Program participants; claims for NYTDA and class members settled; *see* Memorandum & Order dated Aug. 28, 2013, Dkt. 87, p. 14, "Plaintiff has satisfied the pleading requirements for standing to seek redress for its own injuries.").

12.      Defendant City of New York is a municipal entity authorized and created under the laws of the State of New York.  The New York City Department of Finance ("DOF") is the agency of the City which administers its revenue and tax laws of approximately $23 billion per year, including its Parking Violations Bureau, which adjudicates disputed parking tickets, and DOF's Stipulated Fines and Commercial Abatements Programs (the "Programs") for reduced

fines for parking tickets issued to enrolled owners and lessees of certain commercial vehicles ("Program Enrollees").

13.     Defendant Jeffrey Shear is Deputy Commissioner of the NYC Department of Finance for Treasury & Payment Services.

14.     Defendant Agnes Rusin is Director of Parking Operations for DOF.

15.     Defendant Maryann Cordova administers the Fleet/Rental Unit for DOF.

16.     Upon information and belief, the individual named Defendants are responsible directly or have policy and/or supervisory responsibility for the overall administration of DOF's programs involved in this case and the unlawful actions described herein.

## RELEVANT FACTS

### Importance and Prevalence of Parking Tickets in NYC

17.     Parking space on the streets of the City of New York is among the scarcest of commodities. It is of special importance to the owners of commercial vehicles used to make deliveries or to respond to service calls, especially those whose vehicles are used to bring heavy or bulky packages or equipment to their customers' premises.  The burden of parking tickets on owners of commercial trucks and other delivery vehicles in NYC is a very substantial expense and cost of doing business, as it is virtually impossible for them to conduct their delivery business in NYC without receiving a substantial number of parking tickets.

18.     Parking tickets are big business for NYC, and in particular for the DOF.  Parking tickets generated $653 million in Fiscal 2018,[2] a significant increase from $545 million in fiscal

---

[2]     Comprehensive Annual Financial Report of the Comptroller for the Fiscal Year Ended June 30, 2018, p. 256, https://comptroller.nyc.gov/wp-content/uploads/documents/CAFR2018.pdf (retrieved on Oct. 28, 2019)

year 2016.[3]  Although parking fines generate less than 1% of the City's total annual revenues, they comprise over 30% of revenues allocated to the DOF.[4]  The City reported in 2017 that it issues approximately 9 to 11 million parking tickets per year, either by police officers, parking ticket agents, or numerous other persons or officers authorized to issue NYC parking tickets.

**Parking Ticket Administration in NYC**

19.     New York State governs much of the law regulating motor vehicles, their registration, and their use in the State of New York.  VTL § 200 *et seq*.  New York City is authorized to create and enforce its own laws governing the parking of motor vehicles in the City and the scheme for enforcement of the City's laws.  VTL §§ 235 and 236.

20.     Many State laws remain applicable in the City, including VTL § 238(2), which mandates that specific information be included in the "notice of violation" served to commence a parking ticket proceeding and notify the person charged, including for NYC parking violations. The mandatory information required includes the make, model, and body type of the vehicle and "the plate designation and the plate type …"  VTL § 238(2)  "Plate designation" means the license plate's unique alpha-numeric identifier and the "plate type" indicates how the vehicle is registered, *e.g.*, as a passenger vehicle (abbreviated "PAS"), as a commercial vehicle (abbreviated as "COM"), or one of several other "plate types" designated by the New York Department of Motor Vehicles ("DMV").  DOF Rules require the same information as VTL § 238(2) for a valid notice of violation, using slightly different language.  19 RCNY § 39-02(a)(1). DOF's sample notice of violation, *i.e.*, a parking ticket, is attached as Exhibit A.[5]

---

[3]     NYC Budget Brief, Office of the NYC Comptroller 1-2 (May 2017), https://comptroller.nyc.gov/wp-content/uploads/documents/New-York-City-Fine-Revenues-Update.pdf (retrieved on Oct. 28, 2019).

[4]     Comprehensive Annual Financial Report of the Comptroller for the Fiscal Year Ended June 30, 2018, p. 256, https://comptroller.nyc.gov/wp-content/uploads/documents/CAFR2018.pdf (retrieved on Oct. 28, 2019).

[5]     Retrieved from https://nycserv.nyc.gov/NYCServWeb/PVO_Search.jsp on Nov. 6, 2019.

21.     VTL § 238(2-a)(b) mandates that "[i]f any information which is required to be inserted on a notice of violation is omitted from the notice of violation, misdescribed, or illegible, the violation shall be dismissed upon application of the person charged with the violation."  *Accord*, 19 RCNY § 39-02(a)(3).

22.     New York's highest court held 35 years ago that the elements prescribed by VTL § 238(2) are mandatory and, accordingly, go to the jurisdiction of the accusatory instrument.[6] The law is well-established that a valid ticket containing all 5 elements is necessary to lawfully commence a case.[7]

### PVB is the City's "Administrative Tribunal" for Parking Tickets

23.     The Department of Finance established the Parking Violations Bureau ("PVB") as the "administrative tribunal" for adjudication of notices of violations "of any local law, rule or regulation provided for or regulating the parking, stopping or standing of a motor vehicle."  NYC Admin. Code § 19-201; 19 RCNY § 39-01.

24.     The NYC Commissioner of Finance  appoints administrative law judges ("ALJs") to conduct hearings, in person or online, take pleas to the charges, issue subpoenas, render decisions which may impose fines within specified limits, and enter judgments on a judgment roll maintained by PBV, and judgments may also be recorded in a Civil Court of the City of New York..  19 RCNY §§ 39-01, 39-08, and 39-10(g).  An administrative appeal may be taken to a panel of three senior ALJs.  19 RCNY § 39-12.  Judicial review of a final judgment of the PVB can be obtained under Article 78,  N.Y. Civil Practice Law and Rules ("CPLR") and through

---

[6]     Ryder Truck Rental, Inc. v. Parking Violations Bureau of Transp. Admin. of City of New York, 476 N.Y.S.2d 285, 286 (NY 1984), affirmed Wheels, Inc. v. Parking Violations Bureau of Dept. of Transp. of City of New York, 592 N.Y.S.2d 659 (NY 1992). *See* New York Consolidated Laws §171 ("Mandatory provisions of a statute go to the jurisdiction of the person acting, while directory provisions are mere instructions or directions.")

[7]     Nestle Waters North America, Inc. v. City of New York, 990 N.Y.S.2d 512, 516 (1st Dept. 2014)

state judicial appeals.  The City contends that none of these remedies are available to Plaintiff's Program Enrollee members.

25.     Out of approximately 10 million parking tickets issued annually by various City, approximately 2.75 million are contested.  The process of adjudicating parking tickets is time-consuming and expensive for the City, often costing more to adjudicate the than the fine.[8]

## The Stipulated Fines and Commercial Abatements Programs

26.     In 2004, because of the enormous demands on the time and resources of both the City and the owners/operators of commercial vehicles required to make stops as a course of doing business, DOF established a special program for resolving parking tickets issued to commercial vehicles in NYC: the "Program of Stipulated Fines for Vehicles Enrolled in the Fleet Program," (the "Program").  Under the Stipulated Fine Program, participants in the Program "stipulate," without recourse to hearings or appeals, to fines set by the City based on schedules originally derived from actual average hearing results before the PVB.

27.     The 2004 Program rule in 19 RCNY § 39-03.1 very briefly and generally described the terms of the program, including an agreement to "waive the right to contest all notices of violation … and to pay the stipulated fines …," reduced from original fines.  Exhibit B [original § 39-03.1].  Most of the operative terms of the program were contained in the "written agreement" that owners or lessees of enrolled commercial vehicles were required to sign.

28.     On October 12, 2012, NYC Comptroller John C. Liu issued a report critical of DOF's Stipulated Fines Program, claiming it failed to pursue outstanding balances due and others aspects of the program.  Both Plaintiff and DOF disagreed with much of the Comptroller's

---

[8]     New York Times, New York City Cracks Down on Tickets Left Unpaid, https://www.nytimes.com/2010/12/04/nyregion/04tickets.html?searchResultPosition=6 (retrieved on Oct. 28, 2019)

Report.[9]  Nevertheless, in 2013 DOF officially promulgated new rules, which became effective on March 6, 2014, which further codified the "Program of Stipulated Fines for Vehicles Enrolled in the Fleet Program," 19 RCNY § 39-03.1, and the "Program of Commercial Abatements for Vehicles Enrolled in the Fleet Program," 19 RCNY § 39-03.2 (collectively, "the Programs"), and defined clear consequences of the failure to pay the reduced fines, as discussed below.  Copies of 19 RCNY §§ 39-03.1 and 39-03.2 (eff. Mar. 6, 2014) are attached as Exhibit C.

29.     Under these Rules, a Program Enrollee "agrees to waive the right to contest all notices of violation issues against such owner's enrolled vehicles ... and to pay the [reduced] stipulated fine amounts for all such violations."  19 RCNY §§ 39-03.1(a) and 39-03.2(a).

30.     As under the prior version of 19 RCNY § 39-03.1, Program Enrollees submit an application identifying their vehicles, including plate number, state of registration, and plate type, and sign a "written agreement" (on paper or online) to the conditions in DOF's Program Rules.  Copies of the required Application and  Enrollment Agreement forms for the Programs are attached as Exhibit D.[10]  The enrollee agrees that DOF's issuance of electronic bills called "weekly fleet reports" listing the number of violations issued, violation categories, system entry date and the amount due satisfies DOF's notification obligations under City Rules and the VTL and that DOF may require electronic payment.  Exhibit D, p. 4, ¶¶ 3 and 4.  The "waivers" in the Enrollment Agreement are essentially identical to those in the DOF Rules, and the Agreement refers to the Rules for calculation of fines, penalties, and other remedies.  *Id*., ¶¶ 2 and 7.

---

[9]     Tina Kim, Deputy Comptroller for Audit, "Audit Report on the Department of Finance's Efforts to Collect Outstanding Parking Fines from Participants in the Stipulated Fine and Commercial Abatement Programs," https://comptroller.nyc.gov/wp-content/uploads/documents/FM11_110A.pdf (retrieved on Nov. 6, 2019). This Report includes an Addendum with a five-page response dated October 15, 2012 from Elizabeth D. Botwin, DOF's Deputy Commissioner for Administration & Planning.
[10]     Retrieved from https://www1.nyc.gov/assets/finance/downloads/pdf/fleet/stipulated_fine.pdf as of Nov. 10, 2019, form dated Rev. 08.24.18

31.     The so-called Enrollment Agreement is not signed by the City or DOF but is treated by the City as if it were an ordinary contract between independent, private parties.  To the extent that DOF's Rules or Enrollment Agreement purport to waive constitutional rights, they more akin to a criminal plea agreement which requires full disclosure of the rights being given up and must be entered knowingly and willingly.  At best, it is an agreement by Program Enrollees to comply with DOF's promulgated rules for the Programs.  In any event, the agreement does not absolve the City and DOF from their obligations to comply with all mandatory laws of the State of New York and New York City Rules or indemnify their failure to do so whether deliberately or with reckless disregard for these laws and the constitutional rights of the Enrollees' and their designated representative.

### Plaintiff's Position in the Programs as Broker for Owners or Lessees

32.     Plaintiff NYTDA is a for-profit entity, which through its CEO and Chairman Ken Thorpe, represents owners and lessees of commercial vehicles who participate in the Programs, under powers of attorney recognized by DOF.

33.     Plaintiff has approximately 750 members—owners or lessees of commercial trucks and delivery vehicles—that deliver goods and services throughout NYC.  Plaintiff acts on behalf of its members by contract and under powers of attorney with respect to all activities relating to its members, including completing and signing the program application and Enrollment Agreement, processing of parking tickets issued to NYTDA members and advocacy on behalf of its members (and other enrollees in the Stipulated Fine Program).

34.     Plaintiff operates proprietary Association and Fleet Management Software designed to manage various fleet operations for its members, including the auditing, management, and processing of parking violation fleet reports.

35.     DOF transmits Plaintiff's members' fleet reports directly to Plaintiff as the recognized representative and payment processor for those members.  Plaintiff receives and processes more fleet reports than any other participant in the Program because of the large number of its members enrolled in the Program through Plaintiff.  Plaintiff issues periodic bills to members and remits payment for members' parking tickets directly to DOF.  Since 2005, Plaintiff has processed and paid the City over $125 million in stipulated fines from its members.

36.     Plaintiff is deeply familiar and invested in all aspects of auditing and processing parking tickets and fleet payments for its members.  Plaintiff is compensated for its services to its members under an agreement by which Plaintiff receives monthly membership dues or a percentage of the member's savings on their reduced fines in the Programs.

37.     The City's unlawful ultra vires policies that are the subject of this Complaint have a direct detrimental financial effect on the Plaintiff's business and reputation.

**Defendants Unlawfully Changed Billing Procedures
to Enforce Jurisdictionally Invalid Parking Tickets**

38.     A commercial delivery vehicle can only be enrolled in the program by the proper identification of that vehicle's plate number, state of registration and "Plate Type" on the Program application or on the DOF's website accessible via a secure and unique user name and password.  Even though the Program broadly defines "commercial vehicles . . . that make expeditious pick-ups, deliveries and/or service calls" as eligible for participating in the Program, 19 RCNY § 39-03.1(b), the NYS Department of Motor Vehicles ("DMV") actually differentiates between at least two dozen types of "commercial" plates, including COM, IRP, AMB, VAS, TRL, TRC and others.[11]  Properly identifying the "Plate Type" in the Program application and enrollment database is crucial.  Any application for enrollment that does not provide the proper

---

[11]     NYCServ Payment System, available at https://nycserv.nyc.gov/NYCServWeb/NYCSERVMain

plate number, state and plate type exactly as registered with the DMV is automatically rejected by the DOF.

39.     Under the Program rules, DOF is required to issue weekly electronic fleet reports for vehicles as enrolled in the Programs with the state of registration, plate number, and plate type as registered with the DMV and properly enrolled in the Program and entered in DOF's system.  19 RCNY §§ 39-03.1(a) and 39-03.2(a); Exhibit D, p. 4, ¶ 2.

40.     DOF's own website maintains that tickets with incorrect plate types are defective: "[a] ticket is defective if certain required elements are missing, illegible, or mis-described. . . . The following elements are required to be accurate and legible: Plate number, Plate type (for example, PAS, OMT, COM, etc.). . ."[12]  This accords with VTL § 238(2), 19 RCNY § 39-02(a)(1), and the well-established law in New York that a ticket with a missing or incorrect plate type is jurisdictionally invalid and void.[13]

41.     Until recently, DOF issued weekly electronic fleet reports identifying tickets due for each enrolled vehicle by matching tickets from DOF's general database based on the enrolled vehicles' plate number, state and plate type, as registered with the DMV and enrolled in the Program.   If a ticket contained the plate number, state and plate type that matched an enrolled vehicle, the ticket would be reduced in accordance with the stipulated fine schedule and included on the electronic fleet report.  DOF calls this process "collateralization."[14]

42.     If there were tickets that did not match the vehicle data on member applications, those un-matched tickets would eventually "age out," *i.e.*, drop out of DOF's database and never

---

[12]     Dispute a Ticket, Required Elements in a Ticket, available at https://www1.nyc.gov/site/finance/vehicles/dispute-a-ticket.page (last visited on Sept. 30, 2019).
[13]     Nestle Waters North America, Inc. v. City of New York, 990 N.Y.S.2d 512, 516 (1st Dept. 2014)
[14]     Collateralization is a word that has meaning in the realm of banking and finance, but is a peculiar choice when all it means in this context is to *match* one thing with another.  It may indicate the mindset of DOF, which simply sees commercial vehicles in the Programs as collateral for a steady stream of NYC revenue.  Upon information and belief, the word does not appear in any relevant traffic law or in DOF's Rules.

be collected or enforced, along with hundreds of thousands of other invalid tickets that are issued every year.[15]

43.     There had been two incidents in the history of the Program when DOF attempted to charge tickets containing plate type different from how the vehicles were enrolled in the program.  Both attempts were vacated by the DOF administration upon the application by Plaintiff, solidifying the established policy.

44.     In 2009 DOF programmers electronically "corrected" tickets containing the wrong plate type in order to add the "corrected" tickets to enrolled companies' fleet reports. Upon notice from Plaintiff, DOF Commissioner Stark immediately ordered her staff to stop this program, to find all instances where the DOF "computer altered the information" and to issue refunds or credits to companies for any invalid tickets paid as a result of the alterations.

45.     In 2013 the DOF again acknowledged that tickets written to erroneous plate types were not to be collateralized and billed to companies enrolled in the Programs.  As part of Program changes following Comptroller Liu's 2012 audit, DOF issued fleet reports containing thousands of outstanding tickets that had not yet aged out from the system, all of which were written to the incorrect plate types and were thus prima facie invalid and were not previously collateralized due to that defect.  Plaintiff filed disputes with the DOF, arguing that the "participant is only responsible for summonses issued to their enrolled vehicles, reduced and reported to them, so long as they are enrolled."  Every single dispute regarding these tickets was upheld by the DOF and the tickets in question were administratively dismissed.  Furthermore, Defendant Maryann Cordova confirmed the policy that a ticket issued with the wrong plate type would not appear on the fleet reports.

---

[15]     New York Times, New York City Cracks Down on Tickets Left Unpaid, https://www.nytimes.com/2010/12/04/nyregion/04tickets.html?searchResultPosition=6 (retrieved on Oct. 28, 2019)

46.     Based on well-established New York law, the official Rules of the City of New York, and the confirmed policy of DOF to bill enrolled companies only tickets that matched the vehicle's plate number, state and type, Plaintiff's CEO has assured his members for years that no other tickets would be billed.  When Plaintiff's CEO executed the Enrollment Agreements on behalf of its members, he always did so with the reasonable and legitimate expectation that only jurisdictionally valid tickets will be billed through the weekly electronic fleet reports and that the report will contain the full list of tickets due for the specified period.

47.     Plaintiff's expectations and representations to its members were quietly shattered with no advance notice of any kind.  Beginning around June 2019, the City sent thousands of collections notices, retroactively seeking payment for jurisdictionally invalid tickets issued up to 2 years prior to those notices, directly to Plaintiff's members, in violation of N.Y. law, DOF's Rules, the Enrollment Agreement ¶ 2, ¶ 3, and DOF's own website.  VTL § 238(2); 19 RCNY § 39-02(a)(1); Ex. D; and https://www1.nyc.gov/site/finance/vehicles/dispute-a-ticket.page (last visited on Sept. 30, 2019).  All of these tickets had incorrect or missing plate types and many of the tickets had already incurred penalties and had judgments.  All imposed fines in full amounts.

48.     DOF failed to include these invalid tickets in its weekly reports issued to Plaintiff initially because they did not fit with established policy and further to create fear of enforcement for the purpose of obtaining payment on otherwise defective tickets.  Indeed, Plaintiff's first notice of the issue came in the form of panicked phone calls and emails from Plaintiff's members, devastated by the flood of invalid tickets and DOF's payment demands.

49.     Plaintiff's first notice of the evident policy change came when Plaintiff contacted DOF with initial inquiries, innocently viewing the issue as an apparent DOF systems error.  The DOF responded as follows:

> With respect to the issuance of penalty notices, currently, these types of summonses, which indicate an incorrect plate type for a correctly written plate number, enrolled in the program, are being <u>manually placed into the Program</u>, included on a Fleet report, assigned the proper reduced fine and then the penalty cycle is reset and corrected.  Beginning in September, this process will be automated for these types of summonses and no penalty notices should be issued.

(email from Maryann Cordova, DOF Fleet/Rental Unit, to Ken Thorpe, July 26, 2019) (emphasis added).  The email appears to have ratified the DOF ad hoc decision to manually change the enrolled companies' plate type in their database in order to capture all summonses issued to a plate number and state, regardless of the plate type.  This is exactly the same action that had shocked DOF Commissioner Stark in 2009 and was then quickly reversed, with apologies and refunds.  In 2019, however, the New York City's drive for revenue has taken precedence over the fair administration of its own programs, as well as procedural and substantive due process.

50.     Despite assuring in 2013 that "only violations issued to plates enrolled in the program will appear on the fleet report," now in 2019 Defendant Cordova stated:  "Summonses issued to New York registered vehicles will be collateralized based on plate number and state and we will continue to do so.  Your clients have a choice to either accept this practice or withdraw from the Stipulated Fine Program.  We will not engage in further discussion of this issue."  Exhibit E (Cordova Email 2 dated July 31, 2019).  As the sole statement of official DOF policy on this issue, Cordova's position is the epitome of arbitrary and capricious exercise of government powers.  At a minimum, this statement foreclosed any possibility for any administrative review of the City's abuse of authority under its own Rules.

51.     In addition to deliberately flouting established law and policy with no advance notice, itself an arbitrary exercise of the powers of government, the execution of the new policy has been riddled with outright absurdities and due process concerns.  Despite assurances from

the DOF Legal Department that the manual entry of the summonses in question would reset the penalty cycle, and accordingly no enforcement would take place while the changes were being implemented, at least one of NYTDA members was towed due to these unpaid defective tickets. Despite assurances that the manual entry of the summonses in question would result in the "proper reduced fine", only some but not all of the summonses had been reduced upon their entry into the Fleet reports, leaving high exposure to imminent enforcement.  Even the execution of the new policy has been arbitrary and capricious.

52.     Even with the ad hoc reductions, the sheer volume and amounts claimed due retroactively for these invalid tickets –issued up to 2 years prior -- are financially unmanageable for Plaintiff's members who all operate on budgets with increasingly tight margins.  Since Plaintiff had reasonably informed its members that they are not responsible for invalid tickets issued by DOF, many of Plaintiff's members blame it for the situation and several have since terminated Plaintiff's services.  For those who remain, the necessity of processing thousands of old tickets outside the normal billing procedures had placed severe financial strains on Plaintiff's business operations.  DOF's unlawful policy change has caused substantial financial costs to Plaintiff's day-to-day business operations, serious damage to Plaintiff's reputation, as well as the significant trouble and expense of disputing the DOF's policy and litigating this matter.

53.     Further, DOF has added plate type codes in Enrolled companies' DOF electronic records and changed their online enrollment records without authorization from either the companies or Plaintiff.  Upon information and belief, DOF has also been changing issued tickets, altering prima facie evidence, so that they now conform to the plate type in DOF electronic records, as they previously did in 2009.[16]  Even if the decision to massively bill outstanding

---

[16]     In a recent New York Post article, another parking ticket broker claimed that DOF had altered 220,000 tickets after issuance to correct flaws that could result in dismissal.  Dean Balsamini, "City Accused of

jurisdictionally invalid tickets under VTL 238(2) were a reasonable exercise of government power, which Plaintiff disputes, the manner in which DOF has exercised this power is tainted with multiple procedural irregularities.

54. DOF's continued enforcement of invalid tickets in violation of longstanding New York appellate court decisions applying VTL § 238(2), and DOF's own Rules, shows willful or reckless disregard for Plaintiff's and its members rights. *See* footnote 1, above.

55. The DOF Legal Department initially defended the change by claiming – incorrectly – that the Rules at 19 RCNY § 39-03.1 "only indicate that a plate number and state must be enrolled." (Email from Maryann Cordova, DOF Fleet/Rental Unit, to Ken Thorpe, July 26, 2019) The Legal Department's assertion is contradicted by the Rule that it cites, the Enrollment Agreement, ¶ 2, and the enrollment Application, which *require* that the identification of the plate type associated with each plate number.

56. The DOF Legal Department further maintained that even if the parking ticket is invalid under VAT Law § 238(2), Programs participants have waived the right to object:

> It may be that the plate type is incorrectly noted on the summons. However, under the terms of the Program, the participant waived their right to a hearing to challenge that plate type description in exchange for the reduction in fine. That was the bargain the participant made with the City to participate in the Program. The reduction in fines take into account the potential misdescriptions that sometimes occur with the issuance of summonses.

(email from Maryann Cordova, DOF Fleet/Rental Unit, to Ken Thorpe, July 26, 2019)

57. The DOF argument misses the point. First, waiver of constitutional rights in an adjudicatory process must be knowing and voluntary and made only after full disclosure of the

---

Illegally Altering Parking Tickets to Squeeze More Fines from Drivers," New York Post, Oct. 19, 2019, at https://nypost.com/2019/10/19/city-accused-of-illegally-altering-parking-tickets-to-squeeze-more-fines-from-drivers/ (retrieved on Oct. 26, 2019).

rights that are being given up.[17]  The "waiver" extracted by Finance as a condition of participation in the Fleet Program fails to satisfy constitutional requirements for such a waiver.

58.     Second, the participants could not have "waived their right to a hearing to challenge that plate type description" because tickets incorrect plate types have until recently been entirely excluded by established and confirmed policy.  Plaintiff never agreed to have old tickets established as invalid under well-settled law to be retroactively included into fleet reports under the color of (unannounced) policy changes.  It is the unannounced policy to simply bill an entire class of tickets that the City knows are jurisdictionally void that Plaintiff challenges here as a systemic violation of due process and equal protection.

59.     Third, Plaintiff is seeking a declaratory judgment clarifying the unconstitutionality of Defendants' actions.  Where Plaintiff's interest is in relief from future violations, this court has held that the waiver extracted by DOF within the Program does not apply.  *NYTDA, Inc. v. City of New York*, 11-CV-1836 (NGG) (RER) Memorandum & Order, Aug. 28, 2014.

60.     Fourth, waivers which the City demands in order to participate in Fleet Programs for parking tickets are akin to plea agreements between a prosecutor and a defendant in a criminal case, where the government has a much higher duty than in an ordinary private contract.[18]  Parking ticket cases are no longer considered "criminal" in NYC, but the City has

---

[17]     *Brady v. United States*, 397 U.S. 742, 748 (1970); *U.S. v. Ready*, 82 F.3d 551, 556 (2d Cir. 1996).

[18]     The Second Circuit recently reiterated:

[P]lea agreements are significantly different from commercial contracts.  *See Innes v. Dalsheim*, 864 F.2d 974, 978 (2d Cir. 1988) ("Comparing a criminal defendant with a merchant in the marketplace is an inappropriate analogy that we have rejected."); *see also U.S. v. Mozer*, 828 F.Supp.208, 215 (S.D.N.Y. 1993) ("[A] prosecutor entering into a plea bargain agreement is not simply a party to a contract."  The [g]overnment is required to observe high standards of integrity and honorable conduct, and the supervisory power of the court is designed to insure that such standards are observed.").  Our review of a plea agreement is not limited to its four corners, *United States v. Graves*, 374 F.3d 80, 84 (2d Cir. 2004), and we construe them "strictly against the

enforcement tools for parking tickets that are equal to or greater than many criminal penalties: vehicles essential to people's livelihoods and health can be booted, seized, and vehicle registrations suspended or terminated under DOF Rules.

61.     Fifth, the very fact that Plaintiff purportedly waived certain procedural due process rights raises its interest in the fair, transparent and predictable billing policies in the administration of the Program so much more substantive than the interest in an occasionally erroneous parking ticket.  The "waiver" does not give the City license to enforce to judgment parking ticket fines imposed without any process whatsoever, except an unexpected demand for payment, where the failure to comply results in a judgment by administrative fiat, suspension of registrations, and seizure of vehicles.  If the Defendants' argument held any sway, the DOF could simply direct parking agents or police to go out and issue knowingly invalid tickets to commercial vehicles.  Plaintiff has already successfully challenged exactly such practice in 2011.

62.     Changing policy to enable the billing of a specific class of tickets that the City knows are all jurisdictionally invalid, in a deliberate flouting of well-settled law, under a process tainted with procedural irregularities, which trammels significant personal rights, can only be described as willful or reckless disregard for Plaintiff's and its members due process rights and denial of equal protection under the law.

**Penalties and Sanctions Under the Programs**

63.     Under the original 2004 rule in 19 RCNY § 39-03.1, the written agreement was to provide that if the owner failed to pay the stipulated fines for all violations when due, the

---

government." *United States v. Vaval*, 404 F.3d 144, 152 (2d Cir. 2004).  Government conduct in negotiating plea agreements must "comport[] with the highest standards of fairness."  *Id*.  Because such agreements involver waivers of fundamental constitutional rights, "prosecutors are held to meticulous standards of performance."  *Id*. at 153.

*United States v. Feldman*, ___ F.3d ___, No. 17-2868 (2d Cir., Sept. 17, 2019), slip op. 17-18.

agreement was null and void, and all outstanding notices of violation were subject to the standard late penalties under the Rules in 19 RCNY § 39-07.  Effectively, this meant that the reduced fine "reverted" to the original amount upon non-payment and then proceeded to collect late fees.

64.     DOF's new promulgated rules for the Programs effective March 6, 2014 established a new system of sanctions for failure to pay fines.  Under 19 RCNY §§ 39-03.1(c)(3) and 39-03.2(b)(3), the agreement to pay reduced fines will become "null and void" upon the failure to satisfy summonses that enter judgment status, where such judgment(s) total in the aggregate, including interest, more than $350.  Under 19 RCNY §§ 39-03.1(e) and 39-03.2(d), summonses will result in the entry of a judgment against the owner "in the original unreduced fine amount" upon failure to pay the stipulated fine amount within 142 days after the entry of the ticket in the DOF system.  In sum, under the officially promulgated Rules of the City of New York, no reduced fine can revert to the original unreduced amount before 142 days after the system entry date.

65.     In addition, the new Rules imposed a series of three increasing penalties for late payment of the stipulated fines.  Stipulated fines for parking tickets under the Programs are due to be paid within 45 days from DOF summons entry.  The first penalty of $10 accrues if the stipulated fine is not paid within the first 45 days; an additional penalty of $20 accrues if not paid within the next 45 days; and a penalty of $30 accrues if not paid within the next 45 days, a total of 135 days after summons entry.  19 RCNY §§ 39-03.1(e) and 39-03.2(d).  If non-payment continues for another 7 days – 142 days after summons entry -- judgment may be entered for the original, unreduced fine (*i.e.*, the fine is "reverted"), plus all accrued penalties.  19 RCNY §§ 39-03.1(e)(4) and 39-03.2(d)(4).

66.     The Enrollment Agreement is less specific than the official Rules, but not contradictory.  The Agreement ¶ 5 provides that "[f]ailure to pay timely [*i.e.*, within 45 days] shall be deemed … an admission of liability and … *grounds for* … entering a default judgment in the amount of the original unreduced fine amount and the imposition of all penalties and interest provided for in the Finance rules …."  Id. (emphasis added) The Agreement clearly supplements but does not supplant the official Rules.  The definitions of the "Commercial Abatement Program" and the Stipulated Fine Program" in the Rules, 19 RCNY § 30-01, both provide that fines will be paid "*pursuant to*" the provisions in the rules for each Program (emphasis added).  The Agreement does not and could not legally impose its own set of fines and penalties contrary to the duly promulgated DOF rules, which are the law and bind DOF.

67.     The terms of the Agreement clearly reference penalties and interest as "provided for" in the Rules, which in turn informs the exact amounts, timing and order of penalties.  Because the Agreement merely states that failure to pay shall be deemed "grounds for" a default judgment and then references the Rules, without separately specifying a time frame within which such default judgment in the original unreduced amount may be entered, the most direct and simple reading of the Rules and the Agreement together requires the conclusion that a default judgment in the original unreduced amount may be entered only in accordance with the time frame specified in the Rules.  To read the Agreement and the Rules in any other way requires one to ignore the plain meaning of the text in a manner that is entirely irrational or unreasonable.

68.     The rules promulgated in 2014 left the DOF with no authority to revert fines before 142 days after the system entry date.  By deliberately flouting its own regulations, DOF has collected and continues to collect excessive and unauthorized fines and penalties paid prior to entry of judgment since at least March 6, 2014 with no due process.

### DOF Deliberately and Systematically Flouts its Own Regulations
### Regarding Fines & Penalties Paid Prior to Judgment

69.     Plaintiff recently discovered that DOF is and has been deliberately and systematically imposing excessive fines and penalties when tickets are paid between 45 and 142 days from summons entry, in direct contravention of its own Rules that prescribe clear terms for distinct penalty phases and the timing for the reversion of fines to original unreduced amounts. 19 RCNY §§ 39-03.1(e)(4) and 39-03.2(d)(4).  The DOF's unlawful policy wasn't discovered until Plaintiff's systems error resulted in multiple simultaneous payment failures that, because of the wrongful reversions, caused enormous financial strain on Plaintiff's ticket management business.  For a long time, Plaintiff *incorrectly* blamed its own systems for that strain.

70.     Coinciding with the institution of late penalties in 2014, DOF's unilateral changes to their electronic payment system greatly increased the probability and incidence of late payments by Plaintiff and other individual participants in the Programs.

71.     Until 2014, DOF issued weekly fleet reports billing Plaintiff as the representative of enrolled companies.  Plaintiff's computerized systems and procedures were designed to efficiently review and pay the hundreds of weekly bills for its members in a batch and Plaintiff's systems simply and correctly matched its payments with DOF's fleet reports for Plaintiff's enrolled Program members.  As directed by the DOF, Plaintiff paid the fleet reports through the DOF's payment website by ACH payments directly from Plaintiff's bank account.  Because each payment corresponded to the weekly bill for each company with varying amounts, Plaintiff could always verify that its members' tickets were paid.

72.     In 2014, DOF unilaterally ended its batch payment system and required that every parking ticket fine be individually searched and paid through DOF's Commercial Website.  This major change by the DOF gravely impacted Plaintiff's systems, which had been specifically

designed to work with DOF's "batch" billing system.  The change made it extremely difficult for

Plaintiff to properly process, track, and report payments, vastly increasing the incidence of late

payments and unlawful penalty gains for the DOF.

73.     Under the DOF's unilateral system change, Plaintiff was required to pay its

members' individual tickets on DOF's website at https://a836-ccweb.nyc.gov/CCWeb-

1/jsp/frames/frame_main.jsp.  Instead of identifying tickets by weekly fleet reports, that website

lists all tickets issued to a vehicle, including tickets that have not yet become due and tickets that

were not on fleet reports and had not been actually charged to the enrolled company.  Proper

timely payment now requires manually cross-checking of the tickets listed on the DOF's website

with tickets on the weekly fleet reports, manually adding the corresponding tickets to a

"shopping cart" and manually entering ACH payment information in the correct fields.

74.     After registering an ACH payment for each individual ticket, the DOF website

issues a receipt with a "CPY number" for each payment.  Plaintiff pays his members' bills with a

direct ACH payment from Plaintiff's bank.  However, there is no direct way to identify which of

Plaintiff's ACH payments correspond to which CPY number, which ticket-vehicle-fleet report

for which week.  ACH payments can take 1 to 3 business days to clear from the bank account.

75.     DOF's new individual ticket payment system has made it extremely difficult for

Plaintiff, and others, to efficiently and correctly reconcile their bill payments with DOF's bills,

sometimes resulting in errors, including duplicate and missing payments.  Whenever Plaintiff

makes a duplicate payment, the DOF eventually refunds the second payment by check sent

directly to the owner of the enrolled vehicle, resulting in a direct loss to Plaintiff.

76.     Whenever a ticket paid by the member to Plaintiff on time at the reduced rate

incurs late penalties due to Plaintiff's error, Plaintiff covers the difference out of its own funds in

accordance with its internal policy in order to clear the ticket from the DOF system, which does not allow for partial payments. It has now become apparent that Plaintiff paid this difference in accordance with the DOF penalty aging framework that violated DOF's own rules and resulted in significant overpayments since 2014.

77.     The problem was greatly exacerbated following Plaintiff's system upgrades beginning in early 2018. Despite several modifications, Plaintiff's systems failed to reconcile thousands of similar ACH payments without timely alerting Plaintiff to the issue. Plaintiff paid the tickets upon discovery of the error, continuing to cover reverted amounts and late penalties and continuing to view them as isolated events. Due to the increasing number of missed payments, the overall debt on outstanding tickets cascaded to the point that Plaintiff had to turn to DOF for administrative assistance, which was summarily denied.

78.     If the implemented sanctions for late payments would have been in compliance with the Rules, Plaintiff would have paid a $10 penalty on top of the amount paid by its members for each ticket and resolved its initial error in the normal course of business. However, the DOF policy instead required Plaintiff to pay unlawful fine reversions estimated at 4 times the lawful penalty amount or over 30% of Plaintiff's overall payments. It was this policy in violation of clearly prescribed Rules that has ultimately brought Plaintiff to the brink of financial collapse.

79.     Exhibit F demonstrates the practical and very real significance of the difference between the rules and the actual execution of the late penalty phases on a representative batch of tickets recently paid by Plaintiff. On October 9, 2019, Plaintiff paid 136 tickets entered into the DOF system on the week of August 9, 2019. 45 days after the date of entry, or by September 23, 2019, all of these tickets had entered the first penalty phase. According to 19 RCNY § 39-03.1(e)(1), payment after 45 days (but before 90 days) of the entry date should incur a $10 late

penalty per ticket.  Instead, the DOF payment system reverted the fine reduction for all tickets in question.  Instead of paying a penalty of just $1,360 for 136 tickets, Plaintiff paid out of its own funds an additional $5,788 for these 136 tickets, or 4.25 times the lawful penalty amount.  This single payment resulted in an unlawful gain for the DOF of $4,428.  The unlawful gain represents over 30% of the full payment amount of $14,100.

80.    Due to the nature of the DOF payment system, only DOF has access to the exact data on the number and amounts of actual late payments from 2014 through today, to enable Plaintiff to determine the amount of unlawful gains by DOF, that Plaintiff estimates at this point to be in millions of dollars.  DOF has refused to provide access to this data because DOF refuses to acknowledge that their actual practice differs from the directive of the official Rules.

81.    Instead, DOF maintains that a July 2013 letter from Defendant Cordova containing an "example" the penalty schedule has greater authority than the official agency rule on the same subject.  Cf. Exhibit G (Cordova Letter Dated July 1, 2013).  To maintain that a pre-Rule letter somehow carries greater weight of authority than properly promulgated Rules following a public comment taints the DOF penalty scheme, as currently implemented, as an arbitrary and capricious abuse of power.

82.    Since March 6, 2014, the City has no authority to revert reduced penalties before 142 days after system entry.  Yet the DOF now maintains that it can do so because a 2013 letter said so.  The DOF policy of charging Plaintiff and its members excessive and unlawful fines and penalties is a violation of due process.  The potential for state post-deprivation relief is inapplicable here where the deprivation occurs within the structured environment of established state procedures, just as it violates those procedures.[19]

---

[19]    Hellenic American Neighborhood Action Committee [HANAC] v. City of New York, 101 F.3d 877, 880 (2d Cir. 1996).

83.     The purported waiver in the Enrollment Agreement is inapplicable here for all the

reasons stated above in Par. 57-61.  Further, New York public policy also precludes a party from

contractually exculpating him or herself from liability based on gross or willful negligence, much

less deliberate misconduct, especially where the party is a governmental body.

84.     Any penalties collected by DOF during the penalty phases until the entry of

judgment under DOF's collection scheme have resulted and continue to result in an illegal taking

without due process.  It underscores the abuse of power by the department charged with fairly

administering the Program, which instead destroys the Plaintiff's property interest, for reasons

beyond Plaintiff's control, by failing to comply with a statutorily mandated procedure.[20]

85.     This is an ongoing problem.  Until and unless the DOF changes the penalty

schedule in its system to correspond with DOF Rules, it will continue to extract unlawful fines

for any ticket paid between 45 and 142 days after its system entry date.

86.     DOF's Programs have become chaotic and ad hoc, with DOF ignoring

fundamental laws and rules, particularly concerning DOF's process of managing and issuing

parking tickets, penalties, and judgments, which are generated in large volume by DOF's

computers.  When it changes its computer systems and procedures regarding tickets, it is done

without notice and Plaintiff and its members suffer the consequences.

**Financial Injury to Plaintiff and Damage to Its Reputation**

87.     Plaintiff has suffered substantial and ongoing financial injury as a direct result of

the City's unlawful acts.

88.     Plaintiff has paid substantial sums to the City for invalid parking ticket fines,

unlawfully reverted fines, and expenses related to towed vehicles and to registration and license

---

[20]     Logan v. Zimmerman Brush Co., 455 U.S. 422, 432 (1982), citing *Vitek v. Jones*, 445 U.S. 480, 491 (1980).

28

suspensions and judgments issued to its members outside of the Reduced Fines Programs.

Plaintiff has had to resort to highly expensive borrowing to prevent as much damage to

Plaintiff's innocent members.  Plaintiff has had to expend funds for disputing the invalid tickets

and unlawful reversions.  These unnecessary expenses were and are caused by the City's

unlawful issuance and enforcement of invalid and unlawful parking tickets in violation of VTL §

238(2) and its own rules, *inter alia*.

89.     The City's unlawful acts have caused irreparable and ongoing damage to

Plaintiff's reputation with its approximately 750 members, many of whom have received the

invalid parking tickets issued by the City outside of the DOF Programs and have blamed Plaintiff

for this flood of tickets, penalties, and judgments which their enrollment in the DOF Programs

were intended to avoid.

90.     Many of Plaintiff's members have threaten to cease doing business with Plaintiff

and some have done so or will do so in the near future.

91.     Plaintiff has no adequate remedy at law for the irreparable injuries being caused

by Defendants.

**Plaintiff Had a Cordial and Cooperative Relationship with DOF**

92.     Prior to Plaintiff's lawsuits against the City regarding DOF's operation of the

City's parking ticket programs, Plaintiff had a long-standing, cordial, and cooperative

relationship with DOF and its officials and administrators.  Indeed, given Plaintiff broad activism

and direct participation in the Stipulation Fines Program since its inception in 2004, the City

itself has regularly tapped Plaintiff for input into modifications to and improvements in the

Program.  For example, in December 2005, Plaintiff was selected by Defendants themselves,

specifically the DOF, as a representative of all enrolled participants in the Program to test an

29

electronic payment system for the Program.  Plaintiff has helped DOF identify and resolve numerous DOF systems problems.  Plaintiff's CEO has testified before City Council on multiple occasions in support of the Programs.  In general, the Parties gave cooperated in solving various issues throughout DOF's administration of the parking ticket programs.

### Retaliation Against Plaintiff for Prior Litigation Against the City

93.     Upon information and belief, the City has undertaken the unlawful actions against Plaintiff and its members, at least in part, in retaliation for the lawsuits which Plaintiff previously brought against the City concerning DOF's issuance of allegedly improper parking tickets and concerning the DOF's online parking ticket hearing system.

94.     Plaintiff previously sued the City in 2011 for alleged violations by DOF of the law and rules governing DOF's Programs in a case joined by an intervening owner of commercial vehicles enrolled in one of the Programs, alleging that the City was issuing, enforcing, and collecting invalid tickets.  The intervenor's case was certified as a class action and was dismissed following a court-approved settlement with the class.  *NYTDA, Inc. v. City of New York*, No. 11-cv-1836 (E.D.N.Y.).  Plaintiff's claims in that case were also dismissed by the Court upon settlement.

95.     Plaintiff subsequently filed an action against the City claiming that the City had violated Plaintiff's rights in connection with software Plaintiff had developed for conducting parking tickets hearings online.  *NYTDA v. City of New York*, No. 14-cv-5393 (E.D.N.Y.).  That action was dismissed on the grounds of qualified immunity on February 16, 2016.

96.     That cordial and cooperative relationship ended after Plaintiff's cases against the City were resolved in 2016 and it has become an unnecessarily adversarial one.

30

**FIRST CLAIM**
**Under 42 U.S.C. § 1983 for**
**Violations of Due Process and Equal Protection**
**Under Fourth and Fourteenth Amendment to U. S. Constitution**

97.     Plaintiff repeats and re-alleges the allegations set forth above.

98.     Plaintiff has a property interest in its status as a registered brokerage company with DOF, in the fair and transparent administration of the Programs, and in the monies which were unlawfully appropriated from it and its members by Defendants' deliberate policies regarding billing of invalid parking tickets with incorrect "plate types" and pursuing fines, penalties, and judgments for those invalid tickets, in violation of VTL § 238(2).

99.     Plaintiff is informed and believes, and upon such information and belief alleges, that in doing all of the things herein mentioned, Defendants acted under color of the statutes, regulations, customs and usages of the City of New York and the State of New York for purposes of establishing "state action" under 42 U.S.C. § 1983.

100.     Defendants subjected Plaintiff and its members to the foregoing policies without due process and equal protection of the law, contrary to the Fourth Amendment to the United States Constitution, including, without limitation, freedom from unlawful taking of property.

101.     Defendants, acting under color of state law, subjected Plaintiff and its members to the foregoing policies without due process and equal protection of the law, contrary to the Fourteenth Amendment to the United States Constitution, including, without limitation, (a) freedom from deprivation of property without due process of law; (b) freedom from deprivation of property without equal protection under the law.

102.     Plaintiff seeks relief for these constitutional violations under 42 U.S.C. § 1983.

103.    As a direct and proximate result of Defendants' deprivations in violation of the

U.S. Constitution, Plaintiff has suffered damages in an amount to be determined at trial, but not

less than $151,000.

104.    Plaintiff has also suffered irreparable injury to its business and reputation as a

result of Defendants' activities, lacks an adequate remedy at law, and seeks temporary and

permanent injunctive relief.

### SECOND CLAIM
**Under 42 U.S.C. § 1983 for**
**Violations of Due Process and Equal Protection**
**Under Fourth and Fourteenth Amendment to U. S. Constitution**

105.    Plaintiff repeats and re-alleges the allegations set forth above.

106.    Plaintiff has a property interest in its status as a registered brokerage company

with DOF, in the fair and transparent administration of the Programs under New York State law

and New York City Rules, and in the monies which were unlawfully appropriated from it by

Defendants' deliberate policies of prematurely reverting reduced fine amounts to original

unreduced amounts between 45 and 142 days after system entry date.

107.    Plaintiff has also suffered and is suffering damages as a result of Defendants'

refusal to provide payment data and to enter a reasonable payment solution and credit overpaid

reverted fines against late payments resulting from inadvertent errors in Plaintiff's software and

other systems for payments of its members parking tickets, caused in part by Defendants'

multiple changes in the City's software and online systems for payment of parking tickets for

Program enrollees.

108.    Plaintiff is informed and believes, and upon such information and belief alleges,

that in doing all of the things herein mentioned, Defendants acted under color of the statutes,

regulations, customs and usages of the City of New York and the State of New York for purposes of establishing "state action" under 42 U.S.C. § 1983.

109.    Defendants subjected Plaintiff and its members to the foregoing policies without due process and equal protection of the law, contrary to the Fourth Amendment to the United States Constitution, including, without limitation, freedom from unlawful taking of property.

110.    Defendants, acting under color of state law, subjected Plaintiff and its members to the foregoing policies without due process and equal protection of the law, contrary to the Fourteenth Amendment to the United States Constitution, including, without limitation, (a) freedom from deprivation of property without due process of law; (b) freedom from deprivation of property without equal protection under the law.

111.    Plaintiff seeks relief for these constitutional violations under 42 U.S.C. § 1983.

112.    As a direct and proximate result of Defendants' deprivations in violation of the U.S. Constitution, Plaintiff has suffered damages in an amount to be determined at trial, but not less than $151,000.

113.    Plaintiff has also suffered irreparable injury to its business and reputation as a result of Defendants' activities, lacks an adequate remedy at law, and seeks temporary and permanent injunctive relief.

### THIRD CLAIM
**Violations of Due Process and Equal Protection under
Article I, §§ 6 and 7 of New York Constitution**

114.    Plaintiff repeats and re-alleges the allegations set forth above.

115.    Plaintiff has a property interest in its status as a registered brokerage company with DOF, in the fair and transparent administration of the Programs under New York State law and New York City Rules, and in the monies which were unlawfully appropriated from it and its

members by Defendants' deliberate policies regarding billing of invalid parking tickets with incorrect "plate types" and pursuing fines, penalties, and judgments for those invalid tickets, in violation of VTL § 238(2)and in the monies which were unlawfully appropriated from it by Defendants' deliberate policies of prematurely reverting reduced fine amounts to original unreduced amounts between 45 and 142 days after system entry date.

116.    Defendants, acting under color of state law, subjected Plaintiff and its members to the foregoing policies without due process and equal protection of the law, contrary to Article I, Sections 6 and 7 of the New York State Constitution.

117.    Plaintiff seeks relief for these violations of the New York State Constitution.

118.    As a direct and proximate result of Defendants' deprivation violations of the New York State Constitution, Plaintiff has suffered damages in the manner forth above in an amount to be determined at trial, but not less than $151,000.

119.    Plaintiff has also suffered irreparable injury as a result of Defendants' activities, lacks an adequate remedy at law, and seeks temporary and permanent injunctive relief.

**FOURTH CLAIM**
**for Declaratory Relief**
**Under 28 U.S.C. §§ 2201 and 2202**

120.    Plaintiff repeats and re-alleges the allegations set forth above.

121.    Plaintiff seeks declaratory relief and judgment declaring that Defendants' actions described herein are unlawful and otherwise declaring the respective rights of the parties pursuant to 28 U.S.C. § 2201 and 2202.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial of all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in favor of Plaintiff and against Defendants for:

A.     Compensatory damages in an amount to be determined at trial, but not less than $151,000;

B.     Preliminary and permanent injunctive relief enjoining Defendants:

     i.    from terminating all affected fleets under Plaintiff's management from the Programs, and reinstating all fleets that have been terminated;

     ii.    from certifying all affected license plates belonging to fleets under Plaintiff's management for registration suspensions and/or non-renewals to the New York State Department of Motor Vehicles, and cancelling all certifications made for the affected license plates;

     iii.    from enforcing parking violation judgments entered against all affected license plates belonging to fleets under Plaintiff's management, including booting, towing and impounding vehicles;

C.     a Declaratory Judgment under 28 U.S.C. §§ 2201 and 2202 that Defendants' conduct violated Plaintiff's federal and state constitutional rights and further declaring the respective rights of the parties;

D.     an Order to take affirmative action necessary to correct all affected records, vacate all affected judgments on the rolls of the PVB or any court of the State or City of New York, release any affected vehicles booted, impounded, or seized; restore any registration suspensions or terminations; and refund all affected fines, penalties, and judgments;

E.     an Order to dismiss outstanding tickets and refund all fines, penalties and

judgments paid, which were tainted by illegal operation of the Programs,

including illegal reversions or penalties for all affected fleets managed by Plaintiff

F.     an Order to reinstate to the Programs all affected terminated fleets under

Plaintiff's management;

G.     Reasonable attorneys' fees under 42 U.S.C. § 1988(b) and any other applicable

provisions of law, plus costs, and pre- and post-judgment interest; and

H.     Such other and further relief as the Court deems just and proper.

Dated: New York, New York
       November 14, 2019

## VERIFICATION

**KENNETH J. THORPE**, declares:

I am CEO and Chairman of NYTDA, Inc., the plaintiff in the above action. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the allegations in the above complaint are true and correct, except allegations made upon information and belief, which I believe are true.

Executed on November 14, 2019

_____
Kenneth J. Thorpe

Julia Lowenfeld
LOWENFELD LAW FIRM
1706 Sheepshead Bay Road
Brooklyn, NY 11235
(718) 648-4768
julialowenfeld@yahoo.com

*Counsel for Plaintiff*

DANIEL LAW PLLC

By: */s/Al J. Daniel, Jr.*
Al J. Daniel, Jr.
305 Broadway, 7th Floor
New York, NY 10007-1188
(212) 721-0902
ajd@daniellawpllc.com

Zehra J. Abdi
ABDI LAW PLLC
320 West 38th Street
New York, NY 10018-3204
zehra@abdi-law.com

*Counsel for Plaintiff*