UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

NYTDA, INC., aka NEW YORK TRUCKING &
DELIVERY ASSOCIATION,

                Plaintiff,

       -against-

CITY OF NEW YORK; JEFFREY SHEAR;
AGNES RUSIN; AND MARYANN CORDOVA,

              Defendants.

------------------------------------x

**MEMORANDUM & ORDER**
19-CV-6445(EK)(VMS)

ERIC KOMITEE, United States District Judge:

         This case concerns New York City's administration of two parking-ticket programs for commercial vehicles.  Operators of commercial-vehicle fleets tend to get lots of parking tickets in the City, and the programs offer them a bargain: waive your right to challenge parking tickets, and in return the City will discount the cost of your tickets across the board.  Vehicle operators pay less in fines; both sides save the cost of litigating tickets.  In principle, at least, everyone wins.

         In practice, the Plaintiff — a trade organization called New York Trucking & Delivery Association — is not feeling victorious.  It says that after its members signed up for the programs, the City changed its rules and practices to pursue collection efforts for invalid tickets and to charge fines in excess of what New York City's rules permit.  Plaintiff says

these actions contravene State law and City regulation and, more saliently for the instant case, its federal due process rights (among other rights).  Plaintiff brings claims against the City of New York and certain members of its Department of Finance ("DoF") under 42 U.S.C. § 1983 and the New York State Constitution.  Defendants move to dismiss Plaintiff's claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court grants the motion and dismisses Plaintiff's complaint in its entirety.

## I.   Background[1]

### A.   Regulatory Scheme

Generally speaking, the City's parking enforcement regime affords vehicle owners the opportunity to dispute parking tickets before Administrative Law Judges in DoF's Parking Violations Bureau ("PVB").  If they lose, owners can appeal the adverse decisions to a three-ALJ panel within the PVB, and then seek judicial review from New York State courts.

In 2004, the City launched the "Stipulated Fines" program at issue here by promulgating Section 39-03.1 of the Rules of the City of New York ("RCNY").  *See* 19 RCNY 39-03.1.  A limited swath of commercial vehicles — those that "make

---

[1] At the motion to dismiss stage, the Court "must take the facts alleged in the complaint as true, drawing all reasonable inferences in [Plaintiff's] favor." *See In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 91 (2d Cir. 2007).

expeditious pick-ups, deliveries and/or service calls" — was eligible.  *Id.*  Section 39-03.1 authorized the Commissioner of Finance to enter into agreements with fleet owners "for the payment of stipulated [i.e., reduced] fines for parking violations," if the owners agreed in advance "to waive the right to contest all notices of violation issued against such owner's enrolled vehicle during a stated period of time and to pay the stipulated fines for all such violations."  *Id.* § 39-03.1(a). The new rule provided that participation in the program was voluntary and, importantly, that any participant's enrollment was subject to termination "at the discretion of the Commissioner."  *Id.* § 39-03.1(d).

Enrollees in the Programs must sign an Enrollment Agreement.  Am. Compl. ("Compl.") ¶ 30, ECF No. 46.[2]  The Enrollment Agreement memorializes enrollees' explicit agreement to several of the statutory provisions above: it provides, among other things, that enrollees "agree to stipulated fines, as determined by [DoF]"; that DoF "may change any stipulated fine schedule without providing notice"; and that enrollees waive "any claims and defenses based thereon."  Enrollment Agreement, Pl.'s Ex. D ("Enrollment Agreement") ¶ 2, ECF No. 46-4.

---

[2] Page numbers in citations to record documents (excluding deposition transcripts) refer to ECF pagination rather than the documents' native page numbers.

Enrollees waive procedural, as well as substantive, rights: they cede "all rights to a hearing" and agree "to accept [DoF's] determinations as final." *Id.* Summonses issued to enrollees "may not be challenged, contested or otherwise adjudicated by any party, for any reason, either administratively or in court." *Id.* ¶ 7. In addition, enrollees agree that "[e]nrollment . . . is voluntary and may be terminated at any time by either party, for any reason." *Id.* ¶ 8.

As part of the enrollment process, enrollees provide their vehicle's license number, "plate type" (such as a commercial vehicle plate, taxicab plate, trailer plate, etc.), and other information. Compl. ¶ 38. DoF enters this information in its database. *Id.* ¶ 39. When traffic agents issue tickets, DoF enters the vehicle information into its system. If the information on the ticket matches the information for a vehicle enrolled in the Programs, the fine is reduced to the stipulated amount. *Id.* ¶¶ 41-42. The City calls this process "collateralization." *Id.* ¶ 42 n.14. As the tickets are matched and reduced, DoF sends bulk notices to enrollees via electronic "Fleet Reports." *Id.* ¶ 39. For NYTDA's members, the Fleet Reports go to NYTDA.

In 2014, DoF added a second (materially identical) program — the "Commercial Abatement Program" — for commercial vehicles that were not eligible for the Stipulated Fines

4

Program.  *Id.* ¶ 26.  DoF also implemented a penalty schedule for late payments in the Stipulated Fines Program; this schedule was later adapted to the Commercial Abatement Program, as well, in 2019.  *Id.* ¶ 28.  The schedule provides that a $10 penalty accrues forty-five days after DoF entered the violation in its database; another $20 accrues forty-five days later; and another $30 accrues forty-days after that.  *Id.* ¶ 66.  If the ticket remains unpaid for an additional seven days (for a total of 142 days following system entry), DoF enters "judgment against the owner in the original unreduced fine amount . . . , plus the [above] penalties."  19 RCNY § 39-03.1(e)(4); *see also* Compl. ¶ 66.

**B.  Plaintiff's Claims**

NYTDA is a registered "broker" with DoF, which in this context means that it is authorized to act as a representative or agent of a vehicle owner.  *See* 19 RCNY § 39-09 (brokerage rules).  Among other services, NYTDA processes and audits parking tickets for hundreds of enrollees in the Programs. NYTDA executes the Enrollment Agreement on behalf of its members (based on a power of attorney), receives Fleet Reports directly from the City, remits payment to DoF, and then bills its clients.  Compl. ¶¶ 33, 35.  As compensation, NYTDA receives membership dues and a share of the savings its clients receive through the Programs.  *Id*. ¶ 36.

5

Plaintiff alleges that "the City, through DoF and its officials, has two fundamental obligations to Plaintiff" and enrollees in the programs. *Id.* ¶ 6. These are, per NYTDA, "(1) to only pursue parking ticket cases with notices of violations which comply with New York law and DoF Rules," and "(2) to properly calculate fines and penalties for parking ticket violations in accordance with DoF Rules." *Id.* Defendants violated the first of these obligations, Plaintiff contends, when it broke with prior practice and began to charge enrollees for "invalid" tickets — specifically, tickets with missing or inaccurate "plate type" information — in or about 2019. *Id.* ¶ 47. They violated the second obligation, Plaintiff alleges, by charging penalties and late fees that are not authorized by the City's rules.[3] *Id.* ¶ 69.

1.   Invalid Tickets

The Complaint alleges that in June 2019, Defendants began fining enrollees — retroactively and prospectively — for "invalid" parking tickets. *See* Compl. ¶ 47. Because the enrollees did not timely pay the tickets, the City did so at the full rates rather than the discounted rates offered under the

---

[3] These two claims form the core of the complaint; NYTDA also alleges in passing, however, that Defendants are violating its due process and equal protection rights by refusing "to enter a reasonable payment solution" with NYTDA to mitigate its damages, Compl. ¶ 131, and by "deliberately refusing to provide Plaintiff with relevant data concerning DoF's incorrectly calculated fines." *See id.* ¶ 5(3).

Programs.  This practice diverged from the City's prior practice of allowing those tickets to, in Plaintiff's phrase, "age out" of the system without being collected.  *Id.* ¶ 42.  (In the course of this action, however, DoF has represented — and Plaintiff has not disputed — that DoF is voluntarily reversing and refunding the *retroactive* penalties it assessed.[4])

The tickets in question are defective, Plaintiff claims, because they omit or misstate the subject vehicle's "plate type" (commercial, taxi and limousine, etc.).  Plaintiff alleges that this omission not only violates Section 238(2) of New York State's Vehicle and Traffic Laws, *see* VTL 238(2), but renders the tickets jurisdictionally "invalid" under New York State law.[5]

When NYTDA complained about the 2019 shift, defendant Maryann Cordova, a City parking official, confirmed that these notices "are being manually placed into the Program."  Compl. ¶

---

[4] *See* Def. Mem. of Law in Support of Mot. to Dismiss ("Def. Mem. in Supp.") 12 n.2, ECF No. 54 (DoF is "proceeding with the dismissals and refunds of the entire population of parking tickets enforced retroactively, including those that were issued to plaintiff's clients").

[5] *See* Pl. Mem. of Law in Opp. to Mot. to Dismiss ("Pl. Mem. in Opp.") 13.  Plaintiff cites *Nestle Waters North America, Inc. v. City of New York*, 990 N.Y.S. 2d 512, (App. Div. 2014) (citing *Ryder Truck Rental, Inc. v. Parking Violations Bur.*, 62 N.Y.2d 667, 676 (1984)) (tickets omitting mandatory information cannot "survive a jurisdictional challenge and avoid dismissal").  Plaintiff also relies on the text of VTL § 238 itself, which states that "if any information which is required to be inserted on a notice of violation is omitted from the notice of violation, misdescribed, or illegible, the violation shall be dismissed upon application of the person charged with the violation."  *Id.* 2-a(b).

49.  She advised that, going forward, "[s]ummonses issued to New York registered vehicles will be collateralized based on plate number and state" (*i.e.*, ignoring the plate type), and that "your clients have a choice to either accept this practice or withdraw from the Stipulated Fine Program." *Id.* ¶ 50.  The DoF Legal Department maintains that enrollees in the Programs waived their right to object to this practice.  *Id.* ¶ 56; *see also* Enrollment Agreement ¶ 2 (Department of Finance "may change any stipulated fine schedule without providing notice," and enrollee "agree[s] to waive any claims and defenses based thereon").

The City, according to Plaintiff, tried twice to shift its collection practice in this manner in the past, but backed off both times in response to pressure from NYTDA and others. *Id*. ¶ 43.  When NYTDA brought the same issue to DoF's attention in 2009, the presiding Commissioner of Finance promptly stopped the procedure and refunded NYTDA's members for the apparent error.  *Id*. ¶ 44.  Likewise, when NYTDA members began receiving these fines again in 2013, the Association successfully disputed them, and DoF reversed course.  *Id*. ¶ 45.  According to the complaint, defendant Cordova at the time "confirmed [DoF's] policy that a ticket issued with the wrong plate type would not appear on the fleet reports."  *Id*.  This is no longer true.

2.   <u>Excessive Fines</u>

In July 2013, the DoF sent a letter to NYTDA and other enrollees announcing certain "changes to the terms and conditions of the Commercial Vehicle Programs."  Letter dated July 1, 2013 from Defendant Cordova to Plaintiff 2, ECF No. 46-7.  NYTDA's copy of the letter notes that NYTDA had already, by that time, amassed an unpaid fines balance of $9,146.23.  *Id.* at 3.  DoF advised NYTDA that "[t]o continue with the Stipulated Fine program, you must bring your account up to date and sign the attached [revised enrollment] agreement."  *Id.* at 2.

The letter went on to describe changes to the schedule of fines and penalties — specifically, that "[f]or newly issued tickets, payments are due within 45 days of the date of issue"; and furthermore, that "[t]ickets not paid on time *will lose their reduction*" — that is, revert to the unreduced fine amount. *Id.* at 2-3.  The letter went on to say that "penalties will be charged every 45 days."  *Id.*  To ensure the new terms were clearly laid out, the letter provided a sample fine schedule for a late-paid ticket:

3. Tickets not paid on time <u>will lose their reduction</u>, and penalties will be charged every 45 days and then will <u>go into judgment if not paid</u>. Penalties apply to all violation codes.

There will be no opportunity to contest the tickets after the reduction is removed as you have waived your rights to a hearing by participating in this program.

Here is an example of a No-Standing (Hotel Loading) ticket that is not paid on time. The ticket is issued at $115, but since the vehicle is enrolled in the program, the ticket is reduced to $92

| Timeline | Action | Total Amount Due |
|---|---|---|
| Day 1 | Ticket Issued | $92 |
| Day 45 | Payment due date | $92 |
| Day 46 | Reduction is removed | $115 |
| | First penalty is applied | $125 |
| Day 91 | Second penalty is applied | $145 |
| Day 136 | Third penalty is applied | $175 |
| ~ Day 142 | Ticket is placed into judgment | $175 + interest |

*Id.* at 3. The letter also stated that if NYTDA "want[ed] to remain in the program" despite the changes, it would need to "complete the Response Form, sign the [updated] enrollment agreement and return both with payment" by a specified date. *Id.* DoF concluded: "If we do not receive the signed agreement and your account is not up to date as of August 15, 2013, your company and all its registered plates may be removed from the program . . . ." *Id.*

DoF has indeed followed this practice since 2013, despite Plaintiff's protests. Compl. ¶ 86 (alleging that as of the filing date of the operative complaint, Defendants continued to remove the fine reduction after only 45 days). Plaintiff contends that the reversion to an unreduced fine amount after only forty-five days is inconsistent with DoF's own regulations — specifically, the plain language of Section 39.03.1, which provides that the reversion in fine amount will occur after the

142-day sequence described above.  *See* 19 RCNY § 39-03.1(c)(3),
(e)(1)-(4).[6]  Defendants respond that the July 2013 letter
provided clear notice of DoF's plans and that NYTDA agreed to
that approach in the revised the Enrollment Agreement, which
provided: "Failure to pay timely . . . shall be grounds for
rendering and entering a default judgment in the amount of the
*original unreduced fine* amount . . . ."  Enrollment Agreement
¶ 5 (emphasis added).

   3.  System Failures

        Compounding these issues, NYTDA alleges that DoF
changed its systems in a manner that, in part, caused NYTDA to
experience serious system failures.  *See* Compl. ¶¶ 71-77.  Among
other things, in 2014, DoF linked payment to individual vehicles
through DoF's "Commercial Website," rather than the "batch"
reporting system it initially implemented.  *Id*. ¶ 73.  In
effect, rather than receiving all its members' fines in one
report and being able to pay them in a batch, NYTDA must now pay
each ticket individually.  *Id*. ¶ 74.  The resulting break in
communication caused NYTDA to miss payments on behalf of its
members and, in some cases, pay more than required.  *Id*. ¶ 78.

---

   [6] The Schedule was amended in 2014 for the Stipulated Fines Program, and
again in 2018 for the Commercial Abatement Program.

At various points in the complaint, NYTDA acknowledges that *its own* programming errors compounded these payment issues. *See* Compl. ¶ 70 (conceding that "Plaintiff's systems error resulted in multiple simultaneous payment failures"); ¶ 78 ("The [overpayment] problem was greatly exacerbated following Plaintiff's system upgrades beginning in early 2018.  Despite several modifications, Plaintiff's systems failed to reconcile thousands of similar ACH payments without timely alerting Plaintiff to the issue."); ¶ 131 (discussing "fines against late payments resulting from inadvertent errors in Plaintiff's software and other systems for payments of its members parking tickets, caused in part by Defendants' multiple changes in the City's software").

As a result of these issues, NYTDA failed to pay a large number of its members' fines, which incurred significant late fees.  NYTDA agreed (voluntarily) to cover these costs at its own expense, given its role in the missed payments.  *Id.* ¶ 76-78.  In connection with these efforts, NYTDA requested additional data on the fine amounts owed and sought a "reasonable agreement for payment."  *Id.* ¶ 5(3).  Defendants rejected both requests.  *Id.* ¶¶ 81, 131.

4.   Retaliation for Prior Lawsuits

NYTDA alleges on "information and belief" that Defendants took these actions in retaliation for NYTDA's prior

lawsuits against the City.  Compl. ¶ 94 ("Upon information and belief, the City has undertaken the unlawful actions against Plaintiff and its members, at least in part, in relation for the lawsuits which Plaintiff previously brought against the City."). NYTDA has sued Defendants for similar violations twice before. *Id.* ¶ 95-96.

In 2011, NYTDA brought a class action alleging that Defendants directed traffic agents to impose steeper fines on Stipulated Fines Program members.  *See NYTDA, Inc. v. City of New* York, No. 11-CV-1836 (E.D.N.Y. 2014).  Ruling on a motion for judgment on the pleadings and separately on a motion to intervene, Judge Garaufis made two findings relevant here. First, he found that NYTDA had standing to bring claims on its own behalf because it suffered injuries of its own, namely, lost profits and the opportunity costs from "diverting its resources" to contest these issues with the City.  *NYTDA, Inc. v. City of New York*, No. 11-CV-1836, 2013 WL 12358241, at *8 (E.D.N.Y. Aug. 28, 2013); see generally *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (organizations may bring Section 1983 actions on their own behalf when they demonstrate a "perceptible impairment" to their activities).[7]  But the association did not,

---

[7] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations and internal quotation marks.

Judge Garaufis held, have standing based on its execution of the Enrollment Agreements via the power of attorney. *NYTDA, Inc.*, 2013 WL 12358241, at *7.

Second, Judge Garaufis concluded that Plaintiff's constitutional claims were not all precluded by the enrollees' agreement not to contest tickets. *NYTDA, Inc. v. City of New York*, No. 11-CV-1836, 2014 WL 4274219, at *7 (E.D.N.Y. Aug. 28, 2014).[8]  He explained that enrollees waived their right "to contest individual tickets" and certain process rights, but that it was "unlikely" that they "intentionally waived" their constitutional rights "with respect to the fair administration of the program as a whole." *Id.* at *6-7.  Although Plaintiff brought due process claims, those claims were not resolved on the merits.  Judge Garaufis certified the class for settlement purposes and then entered a $14 million judgment pursuant to a settlement agreement.

In 2014, NYTDA brought a second lawsuit, this time alleging that Defendants misappropriated NYDTA's proprietary information for an online parking ticket adjudication program, in violation of substantive due process and state law.  *NYTDA, Inc. v. City of New York*, No. 14-CV-5393, 2016 WL 614685

---

[8] The constitutional claim in that case concerned DoF's practice of charging enrollees for for blocking a traffic lane, a type of ticket from which NYTDA alleged commercial vehicles were exempt. *NYTDA, Inc.*, 2013 WL 12358241, at *3.

(E.D.N.Y. Feb. 16, 2016).  There, Judge Chen dismissed Plaintiff's constitutional claim and declined to exercise supplemental jurisdiction over the state-law claims.  *Id.* at *4.

     5.   <u>NYTDA's Injuries & Requested Relief</u>

NYTDA alleges that it has "paid substantial sums to the City for invalid parking ticket fines, unlawfully reverted fines, and expenses related to towed vehicles and to registration and license suspensions" issued to its clients, and has suffered significant reputational harm.  Compl. ¶ 89.  As a result, Plaintiff claims it is on the "brink of financial collapse."  *Id.* ¶ 79.

NYTDA sues the City of New York; Jeffrey Shear (Deputy Commissioner at DoF); Agnes Rusin (Director of Parking Operations at DoF); and Maryann Cordova (who "administers" the Fleet/Rental Unit at DoF, *see* Compl. ¶ 15).  It seeks compensatory damages, injunctive relief preventing Defendants from taking certain adverse actions against its clients for non-payment (including terminating them from the program or certifying their vehicles for registration suspensions or non-renewals) and from enforcing violation judgments against them, including by towing the vehicles.  *Id.* at 41.  Plaintiff also seeks declaratory relief and an order directing Defendants "to correct all affected records," "vacate affected judgments," release "booted, impounded, or seized vehicles," refund all

fines, dismiss outstanding tickets that were tainted by
Defendants' unlawful actions, and reinstate all affected clients
to the programs.  *Id*. at 41-42.

## II.  Procedural History

At the outset of this case, Plaintiff sought the
injunctive relief described above on a preliminary basis.  *See*
Mem. of Law in Support of Pl.'s Mot. for Order to Show Cause 34-
35, ECF No. 14-1.  Before that motion was decided, the parties
entered a stipulation, agreeing to stay enforcement of certain
summonses — namely, summonses older than forty-five days, and
allegedly "invalid tickets" issued over the past two years —
during the progress of this case.  Agreement and Consent Order ¶
1, ECF No. 25.  In return, NYTDA agreed to make monthly payments
of $50,000 against outstanding judgment summonses.  *Id.* ¶ 4.
The agreement provided that "if NYTDA fails to timely pay any
monthly payment, the DoF is released from any and all
obligations under this agreement and all judgment Summonses will
be subject to enforcement, which includes all remedies available
to DoF."  *Id.* ¶ 7.

On January 27, 2021, Defendants moved to vacate the
stay so that they could enforce the judgment summonses.  ECF No.
39.  Defendants declared that NYTDA had stopped paying the
monthly sum, in violation of the parties' agreement.  Given that
this order disposes of the case, the stay is vacated, by its own

16

terms, ten days from the issuance of this order, and Defendants'
motion to vacate is therefore moot.  Agreement and Consent Order
2.

## III. Analysis

Defendants moved to dismiss Plaintiff's due process
claims (both substantive and procedural) on the grounds that
Plaintiff has not alleged the deprivation of a constitutionally-
protected interest.  Defendants also asserted that Plaintiff
failed to identify similarly situated comparators for its equal-
protection claim.  I granted Plaintiff leave to amend the equal-
protection claim; they filed their amended complaint on March
18, 2021.  Defendants now renew their motion to dismiss.

### A.   Standing

Plaintiff brings this action on its own behalf, Compl.
¶ 11, and Defendants do not challenge its standing.  As
discussed above, Judge Garaufis concluded that NYTDA had
standing to bring claims in its own right (as it claims here).
*NYTDA*, 2013 WL 12358241, at *7; *see Nnebe*, 644 F.3d at 156
(organizations may bring Section 1983 actions on their own
behalf to redress a "perceptive impairment" to their
activities).  NYTDA does not claim standing to bring claims on
behalf of its members (which Judge Garaufis ruled it lacked).  I
agree with Judge Garaufis's ruling that Plaintiff has standing
to bring this suit on its own behalf because it has alleged

17

injuries sufficient to satisfy the Article III standard
promulgated by the Second Circuit in *Nnebe*.[9]  Among other things,
NYTDA alleges that as the registered broker of its members, it
suffered reputational damage and a resulting loss of membership,
and expended additional resources disputing the City's policy
changes.  Compl. ¶ 52.  Under my reading of *Nnebe,* these
allegations suffice at this stage.  *See Nnebe*, 644 F.3d at 156-
158.

## B.   Due Process

NYTDA alleges that Defendants' administration of the
Programs violated its procedural and substantive due process
rights.  To establish these claims, Plaintiff must allege that
Defendants deprived it of a constitutionally cognizable interest
in life, liberty, or property.  *E.g.*, *Plaza Health Labs., Inc.
v. Perales*, 878 F.2d 577, 581 (2d Cir. 1989); *see also DLC Mgmt.
Corp. v. Town of Hyde Park*, 163 F.3d 124, 130 (2d Cir. 1998)
(where a plaintiff claims it was deprived of property right in
violation of the substantive due process doctrine, the court

---

[9] The Supreme Court's subsequent decisions in *Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016), and *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021),
might be read to call *Nnebe's* holding into some question.  I am bound by
Second Circuit precedent, however, even when it is in "tension" with
subsequent Supreme Court caselaw.  *Monsanto v. United States*, 348 F.3d 345,
351 (2d Cir. 2003); *see also United States v. Diaz*, 122 F. Supp. 3d 165, 179
(S.D.N.Y. 2015).

must begin "by determining whether a constitutionally cognizable property interest is at stake").

"Liberty and property are broad and majestic terms," and "property" extends "well beyond actual ownership of real estate, chattels, or money." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 571-72 (1972).  Still, when the asserted property interest is a government benefit, "a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Id*. at 577.  "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke it at a hearing."  *Perry v. Sindermann*, 408 U.S. 593, 601 (1972).

These entitlements may be created, and their contours defined, under "an independent source such as state law" (or, as in this case, New York City's law).  *Paul v. Davis*, 424 U.S. 693, 709 (1976).  Federal law, however, determines whether these interests, once extant, are constitutionally protected.  *See Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978) (where recipient of public utility service had property interest in service where state law required cause for termination, the Court noted that "[a]lthough the underlying substantive interest

19

is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause").

NYTDA claims to have been deprived of three property interests: its interests in (1) "its status as a registered brokerage company with DoF," (2) "the fair and transparent administration of the Programs under New York State law and New York City Rules," and (3) "the monies which were unlawfully appropriated from it by Defendants' deliberate policies" of pursuing invalid tickets and excessive fines.  Compl. ¶ 130.[10] According to Plaintiff, these entitlements "arise from NY and NYC laws and rules that govern the requirements for valid parking tickets, calculation of fines and penalties for such tickets, and the right to payment plans established by DoF." Pl. Mem. in Opp. to Mot. to Dismiss ("Pl. Mem. in Opp.") 23, ECF No. 56.

---

[10] Plaintiff's opposition to the motion to dismiss suggests, in a single sentence, that it has an additional property interest in "a payment arrangement for late payments."  Pl. Mem. in Opp. to Mot. to Dismiss ("Pl. Mem. in Opp.") 23, ECF No. 56.  Plaintiff does not mention this property interest in the amended complaint, nor explain anywhere what it means.  Even if the Court considered this a validly pleaded claim, Plaintiff points to no authority to support the idea that it has a cognizable property interest in a payment arrangement.  This claim fails for the same reasons as its claim of entitlement to fair administration of the Programs does: there is no state law or rule restricting Defendants' discretion to offer or refuse a payment plan.  Section 39.07(c) merely provides that "upon a showing of good cause, . . . any additional penalty assessed . . . may be abated in whole or in part." And Section 39.10 ("Decisions and Judgments") imposes no restrictions on Defendants' freedom to collect full judgments.

1.   <u>Status as a Broker</u>

Plaintiff alleges that Defendants deprived it of its "status as a registered brokerage company with DoF."  *See* Compl. ¶¶ 122, 139; *see generally* 19 RCNY § 39.09 (providing terms for registration of brokers).  Defendants do not dispute that NYTDA has a constitutionally recognized interest in its brokerage license, but argue that NYTDA has not been "deprived" of that interest because it still maintains its status a broker with the City.  Defendants are correct; Plaintiff has failed to establish the requisite degree of deprivation.

Due process protects the "right of occupational choice" in some circumstances.  *Hu v. City of New York*, 927 F.3d 81, 102 (2d Cir. 2019).  Courts have held that citizens possess a "property interest" in certain professional licenses, at least when the government's power to revoke or suspend the license is constrained by law or regulation (for instance, when state law requires "cause" for termination).  *E.g.*, *Barry v. Barchi*, 443 U.S. 55, 64 (1979) (horse-racing license); *Spinelli v. City of New York*, 579 F.3d 160, 169 (2d Cir. 2009) (firearm-dealing license).

To establish a deprivation of their interest in occupational choice, however, plaintiffs must establish "a complete prohibition of the right to engage in a calling."  *Conn v. Gabbert*, 526 U.S. 286, 292 (1999); *United States v. Farhane*,

634 F.3d 127, 137 (2d Cir. 2011) (explaining *Conn*'s holding that "due process is violated only by complete prohibition of the right"); *Hu*, 927 F.3d at 102 ("The Supreme Court, this Circuit, and the other Circuits addressing the issue have all indicated that the right of occupational choice is afforded Due Process protection only when a plaintiff is completely prohibited from engaging in his or her chosen profession."). Thus, courts have concluded that suspensions or revocations of a professional license must comport with due process. *E.g.*, *Barchi*, 443 U.S. 55 (suspension); *Spinelli*, 579 F.3d 169 (revocation); *New York State Trawlers Ass'n v. Jorling*, 16 F.3d 1303, 1311 (2d Cir. 1994) (state may not "deny" or "revoke" lobster-trawling permits without adequate process); *Martine's Serv. Ctr., Inc. v. Town of Wallkill*, 554 F. App'x 32, 34 (2d Cir. 2014) (exclusion from list of approved towing services).

Here, NYTDA does not allege that Defendants suspended or revoked its license. Instead, the association argues that Defendants' actions have "effectively prevent[ed] Plaintiff's [sic] from exercising its rights as a broker." Pl. Mem. in Opp. 24. The complaint does not, however, come close to plausibly alleging a constructive suspension or revocation of NYTDA's brokerage license or any "complete prohibition" of its occupational choice. Indeed, by NYTDA's own admission, it still is operating, collecting membership dues, and serving its

members.  *See generally* Compl. (passim).  Nor does NYTDA cite
any authority showing that a lesser deprivation suffices.[11]
Because these allegations are insufficient under *Conn* and its
progeny, Plaintiff's claims based on the deprivation of its
"status" as a registered broker are dismissed.

 2.  Fair and Transparent Administration of the Programs

 NYTDA next alleges that it "has a property interest .
. . in the fair and transparent administration of the Programs."
Compl. ¶ 122; *see also* Pl. Mem. in Opp. 25-26.  NYTDA's brief is
not a model of clarity on *how* Defendants deprived it of this
right or *what* specific process it believes was due.  Read
generously, however, the complaint suggests that Defendants did
so in three ways: ***first***, by exercising "unfettered discretion to
modify chargeable offenses" in the Programs — presumably a
reference to the decision to enforce tickets with missing or

---

[11] NYTDA does allege that it is on the "brink" of collapse.  *See* Compl.
¶ 79 ("It was this policy [of 'unlawful fine reversions'] in violation of
clearly prescribed Rules that has ultimately brought Plaintiff to the brink
of financial collapse.").  This phrasing evokes a dictum in *Hu*, where the
Second Circuit noted that "nothing in the amended complaint plausibly
suggests that the plaintiffs have been driven out of the construction
business, *or even that they are on the verge of shutting down.*"  *See* 927 F.3d
at 103 (emphasis added).  But NYTDA does not plead sufficient factual matter,
accepted as true, to render this a plausible allegation under *Bell Atlantic
Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and *Ashcroft v. Iqbal*, 556 U.S.
662, 663 (2009); indeed, NYTDA says nothing more specific than the quoted
language above about the likelihood or timing of any insolvency.  And *Hu*
makes clear, in any event, that "business losses alone do not implicate the
Due Process right of occupational choice."  *Id.* at 102.  Moreover, Second
Circuit caselaw is clear that the due process clause does not "preclude
government actions that adversely affect a business's profitability."  *JWJ
Indus., Inc. v. Oswego Cty*, 538 F. App'x 11, 14 (2d Cir. 2013).

inaccurate plate-type information.  Pl. Mem. in Opp. 26.

***Second***, by "disregard[ing] the [applicable] penalty provisions
contrary to State law and its own official Rules."  *Id.*  And
***third,*** by changing its computer systems in ways that caused
NYTDA to miss payments and its clients to incur late fees — late
fees that NYTDA voluntarily absorbed.  Compl. ¶¶ 73, 77, 87.

NYTDA cites no authority for the proposition that a
property interest in the fair and transparent administration of
law is cognizable in its own right, and it is not: the due-
process clause is not a general guarantee of the "fair"
administration of state law.  Instead, a due-process claim
requires the identification of a separate, identifiable property
interest (like money or a license) that gives rise to the
obligation to administer a regulatory scheme fairly before
depriving the holder of that interest.  *See, e.g.*, *New York
State Trawler's Ass'n*, 16 F.3d at 1311 ("Constitutional
cognizance of a property interest in a vocational license
requires states to administer licensing schemes fairly."); *Flood
v. Cnty. of* Suffolk, 820 F. Supp. 709, 713 (E.D.N.Y. 1993)
("When determining whether a plaintiff has a property interest
in the fairness of an application process, the Court must look
to the nature of the interest at stake in the proceeding, not
the nature of the proceeding itself."); *cf. Dangler v. Yorktown
Cent. Schs.*, 771 F. Supp. 625, 628 (S.D.N.Y. 1991) (because

24

plaintiff lacked property interest in membership in National Honor Society, plaintiff also lacked property interest "in the fairness of the selection process" for such membership).

A plaintiff can, in theory, articulate a property interest in a municipality's performance of a particular service in a particular way, but only if (among other things) the government's performance of that service is truly non-discretionary.  *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 766 (2005) (holding that the recipient of a state-issued protective order had no property interest in its proper enforcement).  Put differently, "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."  *Id*. at 756; *see also Senape v. Constantino*, 936 F.2d 687, 699 (2d Cir. 1991) ("In light of the broad discretion afforded state officials charged with administering the Medicaid program, a provider has no reasonable claim of entitlement to continued enrollment in the program."); *Jenkins v. N.Y.C. Dep't of Homeless Servs.*, 643 F. Supp. 2d 507, 512 (S.D.N.Y. 2009) (no property interest in placement within state's homeless shelter program because "broad discretion is given to local authorities in assigning the homeless to shelters").

*Missing and Inaccurate Plate-Type Information.*  Given this principle, NYTDA cannot show that it (or its members) had a

property interest in a free pass for tickets with missing or inaccurate plate-type information.  Plaintiff is apparently arguing that because the City used to dismiss such tickets, it was obligated to do so in perpetuity.  *See* Pl. Mem. in Opp. 13 ("DoF established a policy whereby tickets with incorrect or missing 'plate types' were unenforceable . . . . Beginning in June 2019, without any notice, Defendants reversed its [sic] established policy of excluding invalid parking tickets with incorrect or missing plate types").

Under the plain and unambiguous language of the enrollment agreement, however, DoF unquestionably had the discretion to preclude challenges based on plate-type prior to 2019.  *See* Enrollment Agreement ¶ 7.  It may not have enforced this right, but Plaintiff cites no authority for the proposition that a municipality's voluntary under-enforcement creates a property interest under the Fourteenth Amendment.  *Cf., e.g., Washington Tour Guides Ass'n v. National Park Service,* 808 F. Supp. 877, 882 (D.D.C. 1992) ("Simply put, the government may not be estopped from enforcing the law, even following an extended period of no enforcement or underenforcement.").

Plaintiff's claim is irreconcilable with both (a) the cases discussed above, which unmistakably establish that the government can withdraw a benefit that it provides on a discretionary basis and that it has stated it may amend or

26

withdraw at any time; and (b) the concessions Plaintiff made in
enrolling in the programs — that Plaintiff would accept the
City's determinations on a summons as final and would not seek
to challenge, contest, or otherwise adjudicate that summons,
among other things.  Enrollment Agreement ¶ 2.  In the most
basic sense, Plaintiff is trying to have it both ways: receiving
an across-the-board discount on all tickets, and still be able
to challenge tickets with missing or inaccurate plate types.[12]

Plaintiff denies this.  It says, instead, that it is
challenging a "fundamental procedural irregularity," Compl.
¶ 5(1), and that the enrollment agreement's waiver provision
does not apply to "an arbitrary and irrational course of conduct
without authority under law."  *Id.* ¶ 7.  But sweeping adjectives
cannot mask the fact that Plaintiff is seeking to challenge a
large number of individual, allegedly-deficient tickets by
dressing those challenges up in the language of due process.  As
Defendants point out (and Plaintiff does not dispute), to
satisfy NYTDA's "expectation" that tickets with missing or
inaccurate plate-type information will be dismissed, DoF would
be required to either (a) accept NYTDA's representations about

---

[12] The City continues to make voluntary concessions to NYTDA and other
enrollees in the program, even post- the initiation of this litigation.  *See,
e.g.,* Def. Mem. in Supp. 12 n.2 ("Without admitting any error, DoF is
proceeding with the dismissals and refunds of the entire population of
parking tickets enforced retroactively, including those that were issued to
plaintiff's clients . . . .").

which tickets were deficient, or (b) conduct some individual "review of each ticket to determine if it complies" with the plate-type requirement. Def. Mem. in Supp. 22 n.9. That individual review would, of course, be inconsistent with the fundamental purpose of the Programs. *Id.* (citing *Bolofsky v. City of New York*, No. 100049/2014, at 10 (N.Y. Sup. Ct. Oct. 29, 2014), *aff'd* 46 N.Y.S.3d 59 (App. Div. 2017)).

   ***Allegedly Excessive Fines and Penalties.*** Nor can Plaintiff assert a "fair administration" property interest in DoF's penalty schedule remaining unchanged in perpetuity. Under the terms of the Program, which NYTDA's members freely join (and may leave at any time), "[p]ayment of the amount reported must be made within 45 days of system entry date." Enrollment Agreement ¶ 4. More generally, in signing the Agreement, enrollees "agree to stipulated fines, as determined by Finance." *Id*. ¶ 2. Participation in the program "may be terminated at any time by either party, for any reason." *Id*. ¶ 8; *see also* 19 RCNY § 39-03.1(d). These provisions reflect DoF's broad discretion to implement the penalty schedule it chose in 2013. *See* Letter dated July 1, 2013 from Defendant Cordova to Plaintiff.

   Even if NYTDA had a cognizable property interest here, NYTDA was not deprived of any process due because the City provided notice — via defendant Cordova's letter — that fines

would revert to their full amount upon failure to timely pay fines within forty-five days. *Id.* at 3. The letter reminded Plaintiff that it (and its members) could leave the Program at any point if they did not wish to comply with the new schedule. *Id.* And even if there is an inconsistency between the schedule set out in Cordova's letter, on the one hand, and the schedule in Section 39-03.1, on the other, the latter schedule is itself a DoF pronouncement — one that DoF has the authority to change as it sees fit.[13]

Moreover, it is worth noting that Plaintiff has not alleged direct damages arising from the shift in the City's treatment of plate-type challenges or its allegedly excessive

---

[13] This claim therefore is not, for instance, an example of an executive agency alleged to be applying its rules in a manner that violates a legislative pronouncement.

In any event, while the fine schedule that Plaintiff complains of (and as laid out in the 2013 Cordova Letter) is not identical to the fine schedule set out in 19 RCNY § 39-03.1, it is not contradictory. Section 39-03.1(e)(4) — the provision on which this specific complaint hinges — discusses the necessary condition triggered when a vehicle owner fails to pay a stipulated fine: that failure "will result in the entry of a judgment against the owner in the original unreduced fine amount." That provision, by its terms, does not create the only point at which an owner becomes responsible for the unreduced fine amount. Rather, it describes the details of the judgment entered after 142 days. This is not inconsistent with the City's authority to revert the stipulated fine to the unreduced amount once a vehicle owner fails to timely pay within forty-five days of the ticket's issuance. Such a reading of the regulation is consistent with Plaintiff's allegations about the development of the Stipulated Fines program. Plaintiff alleges that the City has collected "excessive and unauthorized fines and penalties" since "at least March 6, 2014," the very date the 2014 revised version of Section 39-03.1 became effective. Compl. ¶ 69. This is significant because Plaintiff admits that before the 2014 version of the regulation came into effect, "the reduced fine reverted to the original amount upon non-payment and then proceeded to collect late fees." *Id.* ¶ 64.

fines and penalties.  The Programs are designed for the benefit of commercial vehicle owners in the City, not an intermediary such as Plaintiff.  To be sure, Plaintiff has found a business opportunity in efficiently managing parking tickets for owners of commercial vehicles.  That position may confer standing, per *Nnebe*, but it does not give Plaintiff a property interest in a program any more than the general taxpayer possesses a property interest in the administration of any government program for purposes of a due process claim.  *See Harrington v. Cnty of Suffolk*, 607 F.3d 31, 35 (2d Cir. 2010) (no individual property interest in police investigation because "such universal benefits are not property interests protected by the Due Process Clause").  Plaintiff is *advancing* money to pay tickets it believes violate due process for their lack of plate-type information, but it is not liable to pay those tickets and it is ultimately reimbursed for any payments it makes, notwithstanding its voluntary choice to pay late fees or penalties for its members.  Compl. ¶ 77-78.  And as Defendants point out, Plaintiff asserts (and has) standing only to sue for its own injuries, not to invoke the power of attorney to seek to vindicate the injuries suffered by its members.  *See* Def. Mem. in Supp. 20 n.7 (citing Compl. ¶ 11; and then citing *NYTDA, Inc.*, 2013 WL 12358241, at *7).

30

*Computer Systems Changes.*  Plaintiff's complaint about unfair and non-transparent administration of the Programs also seems to be based on the City's computer-programming changes, which NYTDA describes as "chaotic and ad hoc."  *See* Compl. ¶ 87 ("When [DoF] changes its computer systems and procedures regarding tickets, it is done without notice and Plaintiff and its members suffer the consequences.").  To the extent this is true, Plaintiff has failed to state a plausible claim under *Twombly* and *Iqbal*.  Among other things, negligent action cannot be the basis for a due-process claim, *see Shannon v. Jacobowitz,* 394 F.3d 90, 94 (2d Cir. 2005), and NYTDA does not allege (at all, let alone plausibly) that DoF modified its computer systems with the intent to cause NYTDA to miss payment obligations.

### 3.  Loss of Monies

Plaintiff alleges that it has a property interest in the money it paid to DoF on behalf of its members.  It is undisputed that vehicle owners have a property interest in money exacted for parking tickets.  *See, e.g.*, *Farina v. MTA*, 409 F. Supp. 3d 173, 206 (S.D.N.Y. 2019); *Rackley v. City of New York*, 186 F. Supp. 3d 486, 480-81 (S.D.N.Y. 2002) (parking fines and vehicle seizures implicate property interests).  But NYTDA is not a vehicle owner.  Its losses derive solely from voluntary agreements that it reached with its members.  Voluntary payments on behalf of its members such as these do not give rise to

31

constitutional claims.  *Cf. Dowd v. DeMarco*, 314 F. Supp. 3d
576, 586 (S.D.N.Y. 2018) (no support for claim that "the
voluntary expenditure of attorneys' fees in one's own defense .
. . qualifies as deprivation of a protected property right");
*Bonura v. Chiarlitti*, No. 8-CV-10190, 2010 WL 11712789, at *13
(S.D.N.Y. Mar. 31, 2010) ("[I]n general, a public employee who
resigns voluntarily may not claim that he or she was deprived of
employment without due process.").  Even if they did, this
adverse effect is more indirect than the one in *O'Bannon v. Town
Court Nursing Center*, which caused *involuntary* harm to third
parties, unlike the self-imposed effects Plaintiff suffered
here.  447 U.S. 773, 775 (1980) (nursing home residents had no
property interest in government's withdrawal of funds from
nursing homes, even though the withdrawal resulted in the
closing of the home and hardship on the residents).  The
reasoning in *O'Bannon* informs my conclusion here: there is a
"simple distinction between government action that directly
affects a citizen's legal rights, or imposes a direct restraint
on his liberty, and action that is directed against a third
party and affects the citizen only indirectly or incidentally."
*Id.* at 788.

NYTDA has not asserted associational standing.  It
only claims standing to sue for its own injuries.  Compl. ¶ 11
("Plaintiff has standing to bring this action for its own

32

financial and reputational injuries."). Any loss of its own money is not, under the circumstances, the direct result of government action. NYTDA proclaims that its "revenues are derived from its Members." Pl. Mem. in Opp. 27. These losses of revenues, even if substantiated, are too removed from the government action complained of here. *See Progressive Credit Union v. City of New York*, 889 F.3d 40, 53 (2d Cir. 2018) (no property interest in decreased market value of taxi medallions as a result of loosening of taxi licensing regulations). Plaintiff's losses are, instead, a product of its customers concluding that they are not getting the benefit of the bargain they had hoped for when signing up with Plaintiff.

Moreover, even assuming that NYTDA has a property interest in the money it paid on behalf of members, for the same reasons the Court has outlined above, NYTDA has not been unconstitutionally *deprived* of any process due. NYTDA voluntarily entered into a program with the knowledge that DoF would set the terms and could even terminate the program at any point. DoF provided notice through the 2013 Cordova letter that the fines would revert to the normal amount once payment became untimely. And DoF had complete discretion to enforce its policy of collecting fines when plate types were inaccurate or missing (or, if it chose, to remove Plaintiff from the program for any

reason at any time).  Most importantly, Plaintiff voluntarily
waived its right to contest these tickets and penalties.[14]

\*   \*   \*   \*

At bottom, Plaintiff's claims sound less in due
process protected by the constitution and sound more in the
realm of dissatisfaction about its perceived benefit of the
bargain in its agreements with the City.  If NYTDA thinks the
City is violating its obligations under the enrollment agreement
such that the City is in breach of contract, it may find remedy
in state court (as set forth in note 13, *supra*).[15]

C.   **Equal Protection**

After oral argument, the Court granted Plaintiff leave
to amend its complaint for the purpose of supplementing its
equal protection claims to add allegations about the specific

---

[14] It may well be that NYTDA believes that DoF's actions exceeded its
rights under the enrollment agreement.  But states and municipalities enter
into thousands of contracts every year, and it is not the case that every
alleged breach of contract may be the subject of a due process claim.  *See
Lujan v. G&G Fire Sprinklers, Inc.*, 532 U.S. 189, 195-97 (2001)
(subcontractor to company contracting with state entity had no due process
claim for alleged breach because "California law affords respondent
sufficient opportunity to pursue that claim in state court").

[15] Plaintiff also purports to bring substantive due process claims on
the same alleged facts as its procedural due process claims.  Like a
procedural due process claim, "[t]o establish a substantive due process claim
a plaintiff must demonstrate a deprivation of a protected property interest."
*Knox v. Town of Southeast*, 599 Fed. App'x 411, 413 (2d Cir. 2015).  The
reasons that Plaintiff's procedural due process claims fall short apply with
equal force to its substantive due process claims.  In addition, a
substantive due process claim requires more: the deprivation of the property
interest must be "so egregious, so outrageous, that it may fairly be said to
shock the contemporary conscience."  *Id.*  Plaintiff has not established this
prong of a substantive due process claim, given the analysis above.

entities purportedly receiving disparate treatment.  *See* Mem. Of Law in Supp. of Mot. to Amend Compl. 3, ECF No. 43-3.   The amended complaint alleges that Defendants were treated unfavorably relative to only one broker identified by name — Glen Bolofsky (and certain companies he operates).  Compl. ¶ 99. NYTDA alleges (again on "information and belief") that DoF favors Bolofsky by allowing him to challenge tickets, not imposing fines and penalties on his companies, and allowing his clients to accumulate fines and penalties over many years without enforcing judgments.  *Id*. ¶¶ 105-108.[16]  NYTDA admits, however, that Bolofsky and his clients are not part of the Programs.  *See* Compl. ¶¶ 107, 113-14, 118; *see also* Mem. in Opp. 34 ("The comparators are other brokers, specifically Greg Bolofsky and his companies, and all the other recipients of parking tickets who are *not* enrolled in the reduced fines Programs.").

     For obvious reasons, this dooms NYTDA's equal protection claim.  *See Progressive Credit Union*, 889 F.3d at

_____

[16] Much of Plaintiff's equal protection claim is grounded in threadbare factual recitations made "upon information and belief."  *See, e.g.*, Compl. ¶¶ 98-99, 106, 118.  Plaintiff alleges that it is treated differently than comparators, but provides little in the way of factual allegations as to how or why the City is selecting it out from its purported comparators.  *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) ("The *Twombly* plausibility standard, which applies to all civil actions, does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible.").

50-51 (alleged comparators — "for hire-vehicle" services like
Uber or Lyft — were not "similarly situated" to medallion
taxicabs because they acquire customers in different ways such
that government had basis for different regulatory treatment);
*Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59-60
(2d Cir. 2010) (developer of large housing tract not "similarly
situated" to developers of single homes, renovated projects, or
commercial buildings for equal-protection claim involving
municipal permitting process).

Plaintiff does not allege that it is being
discriminated against because of its membership in a protected
class.  Instead, NYTDA argues that the City discriminates
against it by "deliberately and selectively enforcing invalid
tickets and imposing unlawful fines" when compared with its
treatment of "other similarly situated parking ticket brokers."
Compl. ¶ 5(4).  Plaintiff goes on to claim that it is a "class
of one" for purposes of its equal protection claim.  *Id.* ¶ 120.
These equal protection theories are judged under the rational-
basis standard.  *See Progressive Credit Union*, 889 F.3d at 49;
*Plaza Motors of Brooklyn, Inc. v. Cuomo*, No. 20-CV-4851, 2021 WL
222121, at *5 (E.D.N.Y. Jan. 22, 2021).

The Second Circuit recognizes two pathways for
establishing equal protection claims based on alleged selective
enforcement.  *See Hu*, 927 F.3d at 91.  While both standards

36

require a showing that similarly-situated comparators were treated differently, the level of similarity differs between the two.  (Plaintiff claims that it is not required to identify comparators in a "class of one" claim at this stage, Pl. Mem. in Opp. 36-37, but this is incorrect.)  *Olech* ("class-of-one") claims,[17] which are based solely on disparate treatment between similarly-situated comparators, require a showing of "extremely high" similarity, such that "no rational person" could regard the disparate treatment as reflecting "the basis of a legitimate government policy" or a "mistake."  *Hu* 927 F.3d at 94.  *LeClair* claims[18] (for bad-faith selective enforcement), by contrast, require a lesser showing that the comparators bear a "reasonably close resemblance," meaning they are "similarly situated in all material respects" — but require an additional showing that the "selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as . . . a malicious or bad faith intent to injure the person." *Id.* at 96.

Even assuming Plaintiff has adequately alleged the second element of a *LeClair* claim (because it claims Defendants retaliated against Plaintiff for filing lawsuits), it has not

---

[17] *See generally Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).

[18] *See generally LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980).

identified any comparators that are "similarly situated in all material respects" (*LeClair*) – let alone ones that exhibit an "extremely high" degree of similarity (*Olech*).  Nor can it, if the proposed comparators are those *outside* the relevant Programs.  Given the chance to amend its complaint to provide more evidence of comparators, Plaintiff again offered only examples outside the Programs.  *See* Compl. ¶¶ 107, 113, 118; *see also* Pl. Mem. in Opp. 34, 36.  Accordingly, Defendants' motion to dismiss this claim must be granted.

### IV.   State-law Claims

Because I have dismissed Plaintiff's federal claims, I decline to exercise supplemental jurisdiction over the remaining state-law claims.  *See also Oneida Indian Nation of New York v. Madison Cnty.*, 665 F.3d 408, 437 (2d Cir. 2011) ("[W]e have repeatedly said that if a plaintiff's federal claims are dismissed before trial, the state law claims should be dismissed as well."); 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction.").

## V.    Conclusion

For the reasons stated above, the Court grants Defendants' motion in its entirety.  The Clerk of the Court is respectfully directed to enter judgment and close this case.


SO ORDERED.

___/s/ Eric Komitee_____
ERIC KOMITEE
United States District Judge


Dated:    March 18, 2022
          Brooklyn, New York